MERRIMACK.

BOSTON, CONCORD & MONTREAL RAILROAD *v.* BOSTON & LOWELL RAILROAD.

SAME *v.* BOSTON & MAINE RAILROAD AND BOSTON & LOWELL RAILROAD.

SAME *v.* SAME.

Under *c.* 232, Laws 1881, the railroad of the Manchester & Keene company was legally purchased by the Lowell and the Concord companies, and was legally operated by the Lowell company in 1884.

The union of the Montreal and the White Mountains roads formed a continuous line, within the meaning of the proviso of *s.* 17, *c.* 100, Laws 1883.

That section does not require the roads of lessor and lessee to be contiguous, and does not make the state's assent to a lease to a foreign railroad company depend upon the foreign corporate power of the lessee.

A lease of a railroad, approved by a two-thirds vote of the stockholders, and made in compliance with the act of 1883, is not contrary to public policy, and cannot be set aside at the suit of the state, or at the suit of the stockholders who voted to approve it.

If it is illegal, its illegality does not extend beyond its violation of the partnership contract of the stockholders; and of that violation an objecting minority alone can complain.

By an unexplained delay of nearly three years in bringing suit, the objection of the dissenting stockholders is waived.

A lease of A's road to B is not made dependent upon the validity and continuing existence of a lease of C's road to B by a covenant that A shall receive from B a monthly statement of the gross receipts of C's road, and shall have an opportunity to inspect its books and accounts.

When an action at law is an adequate remedy for a forfeiture of the estate conveyed by a lease of a railroad, equity may leave the lessor to that remedy.

When legal process against responsible claimants of a railroad is an adequate remedy for a neglect to keep the road in suitable repair, the remedy of a receivership may be denied.

A covenant by the lessee of a railroad not to assign the road is broken by his assignment of the future gross earnings of the road to a third person, and contracting to use and operate it under the direction of the assignee.

(ALLEN, BLODGETT, and BINGHAM, JJ., dissenting.)

THREE ACTIONS, originally entered in the trial term.  The first and second are bills in equity, and the third is a real action.  The first having been removed to the circuit court of the United States, they were all entered and tried in the law term of this court, under the following agreement:

Merrimack ss.                                          Supreme Court.
                    June Law Term, 1888.

Boston, Concord & Montreal R. R. *v.* Boston & Maine R. R., Boston & Lowell R. R.

It is agreed,—

I. That the bill in equity (lease case, so called), now pending in the United States circuit court, be at once remanded to the New Hampshire supreme court; that the three cases—ejectment suit, bill in equity filed March 30, 1888, and lease case (so remanded)—be consolidated, and tried as one case in the New Hampshire supreme court; that the Boston & Lowell Railroad shall appear at once in all said suits without further notice, the proceedings being amended by joining them as parties; that the Boston & Maine Railroad and the Boston & Lowell Railroad will not attempt to remove any question arising out of said cases to the United States circuit court.

All the testimony now taken in each of the cases may be used in the consolidated case; all further testimony on both sides to be taken and concluded before July 15, 1888.

The defendants' pleas and answers shall be filed before June 1, 1888.

All the parties agree that final arguments shall be made before the supreme court at the December law term, 1888, and the consolidated case, and all questions arising thereon, shall then be submitted to said court for final determination, and both parties shall urge the court for a speedy decision.

II. The Boston & Lowell Railroad or Boston & Maine Railroad shall, in all respects and without delay, put, and hereafter maintain, said Boston, Concord & Montreal Railroad property into a safe and proper condition for doing its business, to the satisfaction of Hon. B. A. Kimball and Hon. John W. Sanborn, who shall determine in regard to the same.

Among other repairs and renewals which the Boston & Lowell Railroad or Boston & Maine Railroad agree to make on said Boston, Concord & Montreal Railroad without delay are the following:

The four-span single-lattice bridge (No. 12 in the report) just north of Tilton station shall be rebuilt.

New track stringers shall be laid, and other general repairs made, on the third bridge north of Tilton (bridge No. 14).  No. 16, trestle over highway at East Tilton, shall be rebuilt.

The trestle over the Winnipesaukee river at East Tilton (No. 17), Rum Hill bridge, so called (No. 66), and Bath Upper bridge,

so called (No. 68), shall be immediately rebuilt, or strengthened and repaired in such a way as to be made safe and suitable for the business of the road, according to the judgment of said Kimball and Sanborn.

All of the other bridges on said Boston, Concord & Montreal Railroad, including stringer bridges and culverts, not now in safe or suitable condition for the business of the road, shall be at once repaired or rebuilt, according to the judgment of said Kimball and Sanborn.

It is also agreed that the said Boston & Lowell Railroad or Boston & Maine Railroad shall at once put into the Boston, Concord & Montreal Railroad line a sufficient quantity of ties, ballast, and 60-pound steel to put said road into a safe and suitable condition for its business; but the parties being unable to agree upon the precise number and amount of each that are needed, the same shall be determined according to the judgment of said Kimball and Sanborn.   The Boston & Lowell Railroad and Boston & Maine Railroad agree to make, without delay, all other repairs and renewals which may be necessary in order to put the entire road into a safe and suitable condition for its business, according to the judgment of said Kimball and Sanborn.

The traffic of the road shall not be diverted by the Boston & Maine Railroad pending the decision in said cases.   The usual summer business shall be encouraged by the Boston & Lowell Railroad, and the passenger service and equipment shall be kept equal to that of past years.

III. Nothing contained in the foregoing agreement, and nothing done under it, shall be construed as an admission by either party to it, and shall not be used, discussed, or considered in determining the merits of the case upon final submission; and neither shall it change or affect the manner or basis of accounting between the parties.

All differences of opinion between said Kimball and said Sanborn shall be at once submitted to James R. Kendrick, general manager of the Old Colony Railroad, who shall finally determine what and how much shall be done.

The parties will make and execute all such further agreements as may be necessary or convenient to carry the foregoing into effect.

In consideration of the foregoing agreements by the Boston & Maine and Boston & Lowell railroads, the Boston, Concord & Montreal Railroad agree that the application for the appointment of a receiver, and other temporary relief, shall be suspended.

Concord, N. H., May 7, 1888.

Boston & Maine Railroad,
by Richard Olney, Charles H. Burns.

The Boston, Concord & Montreal Railroad,
by its solicitors, Chase & Streeter, Bingham & Mitchell.

Boston & Lowell Railroad,
by T. Jefferson Coolidge, President.

There were 1671 printed pages of pleadings, depositions, and documentary evidence, and 758 pages of printed argument.

*H. Bingham, Chase & Streeter*, and *Jeremiah Smith*, for the plaintiffs.

*A. A. Strout, J. H. Benton, Jr., R. Olney*, and *C. H. Burns*, for the defendants.

DOE, C. J. The first of the three suits is a bill in equity, in which the plaintiffs ask a decree against the validity of the contract by which they undertook to lease their road to the Lowell in 1884. In 1883 the legislature had given all the authority they could give for leasing the road upon certain conditions. "Any railroad corporation may lease its road . . . to any other railroad corporation upon such terms and for such time as may be . . . agreed to by the directors, and as may be . . . approved by two thirds of all the votes cast on that subject by the stockholders. . . . No competing railroads, now prohibited by law from leasing or uniting, shall have a right under the provisions of this act to . . . lease each other, unless said roads, or one of them, has heretofore leased or united with some other road or roads, for the purpose of forming a continuous line, or shall hereafter, or at the time of such lease . . . unite with or lease some other road for such purpose. . . . Railroad corporations created by the laws of other states, operating roads within this state, shall have the same rights for the purposes of . . . leasing . . . other roads as if created by the laws of this state." Laws 1883, c. 100, ss. 17, 18. The first question is, whether the lease of the Montreal road to the Lowell company complied with all the terms prescribed by law as conditions of the state's assent.

The lessees are a Massachusetts corporation. Were they "operating" a railroad in this state, within the meaning of s. 18? In the literal and ordinary sense of the word, they were operating the Manchester & Keene road. They and the Concord company had bought it. Each of the corporate purchasers had a deed of an undivided half. In a practical and equitable sense, they were joint proprietors of the road. The Lowell were operating it for themselves and the Concord. For many of the purposes of responsibility, the Lowell were proprietors (*State* v. *Railroad*, 58 N. H. 410); and if they were operating it legally, under a good title or valid contract, with the consent of the state and of all parties in interest, it is not material who had the profit and loss.

The Manchester & Keene company had mortgaged their road under authority given by c. 142, Laws 1873. In 1881, an act (c. 232) had been passed, entitled "An act in relation to the foreclosure of the Manchester & Keene Railroad." The legal mean-

ing of parts of this act is materially affected by the peculiar cir-
cumstances of disaster and danger for which the act shows the
legislature intended to provide.   The contemplated foreclosure
indicated the bankruptcy of the Manchester & Keene company,
and their inability to perform their public duty of transportation
in the district their road was designed to accommodate.   The
third section of the act recognizes the need of powers of sale and
purchase specially adapted to secure the completion and effective
operation of the road.   The legislature evidently understood there
was reason to fear that whatever might be the prospect of a sale
of some part or parts of the road, there would be difficulty in find-
ing a purchaser willing to pay all the debts, and take the road
with an obligation to complete, maintain, and operate the whole
of it.   The stipulation, that "nothing in this act contained shall
be construed to authorize the discontinuance of any portion of said
road," reveals an apprehension that the authority given the trus-
tees to sell it "as a whole or in suitable parts," and the authority
given the purchasers to sell "the whole or any part thereof at pri-
vate sale, if they think such sale best calculated to secure the
effective operation of the whole road," might be construed as an
assent to a discontinuance of some part that would not pay the
expense of operation.   While the bankruptcy of the corporation
and the losses of the stockholders might be irretrievable, a sale
under a prohibition of discontinuance might save something for
the creditors without subjecting the public to the loss of any part
of the road.

The act discloses no purpose to withhold from nonresidents the
privilege of bringing their money into this jurisdiction, and devot-
ing it to public use in this unpromising enterprise.   It contains no
allusion to the subject of their laboring under a peculiar disability,
and suggests no reason for shutting them out of this branch of the
public service.   It does not require the purchase to be made by a
corporation, or by more than one person.   Neither in express
terms, nor by fair implication, does it require the purchaser to be
a citizen of New Hampshire or of the United States.   In the
attempt to rescue the highway from extinction, it is not to be
assumed that the legislature must have meant to deprive the pub-
lic of the pecuniary aid and personal services that might be
offered by strangers and foreigners.   For all necessary and proper
purposes, the road and its purchasers and operators would be sub-
ject to New Hampshire law, and to the verdicts of New Hamp-
shire juries in all courts, state and federal.   There is in the act no
intimation of a preference for the opinions of this court on ques-
tions of local law, or an intention to adopt an inability to remove
a case to the federal court as a test of the right to be a purchaser.

Express consent is given to a purchase by "any railroad com-
pany."   Taken without qualification, this clause includes foreign
as well as domestic railroad corporations.   The words "any rail-

road company" might be used in a connection and for a purpose that would show a restricted sense not including foreign companies. Here is no evidence of a purpose to exclude them; and the general scope of the act, and the impending danger for which it attempted to provide the best available remedy, furnish abundant reason to believe the rejection of foreign aid was not intended. So much of the road " as may be purchased by any railroad connecting therewith, either directly or through lines which it leases or operates, may thereupon be made a part of the railroad purchasing the same as aforesaid, the same as if it had been originally incorporated as a part of its railroad; and said railroad shall have all the rights, powers, and privileges necessary to carry this act into effect." How many connecting railroads are within this clause we need not inquire. It describes the Lowell as a company authorized to be a purchaser, so far as authority can be given by New Hampshire law. And without this clause, considering to what extent the Manchester & Keene road must have been designed to be a means of communication between southern New Hampshire and Boston, and to what extent economy and public convenience would be consulted by its being run as a part of the Lowell, a legislative intent to exclude the Lowell and every other foreign company from the right of purchase could not be found without clear evidence of a discrimination so manifestly calculated to defeat the object of the act.

Words literally importing the singular number may extend to several persons or things when such is their apparent meaning. By this rule of construction, the act authorizes several railroad companies to be joint purchasers of the whole or any part of the road. And this meaning is in the provision of *s.* 4 (amended by *c.* 246, Laws 1883) giving a certain authority to "the railroad or railroads purchasing the said Manchester & Keene Railroad, or any part thereof." " The railroad or railroads " making such purchase " are authorized to issue bonds, secured by mortgage on their own road, . . . or on the property purchased, or on both jointly." The legislature were content with giving all the needed authority they could give to invite bids from citizens and aliens, residents and non-residents, incorporated railway companies and unincorporated persons, and to induce them to save this road for public use, without undertaking to exclude any for want of foreign corporate power. The consent of another state was not made a condition of the consent of this state. The authority to make a mortgage and increase capital stock, which was given to those purchasers to whom New Hampshire could give it, included the assent of this state to a joint mortgage of this road and a foreign road of the purchasers. The Lowell company operated this road, with the consent of the state, under the act of 1881. If any stockholders of the Lowell were ever entitled to an injunction in this state, they apparently waived it by laches. The burden of proof has

not been shifted from the plaintiffs to the defendants; and it does not appear that, at the date of the Montreal lease, the Lowell company could have been expelled by legal process from the Manchester & Keene road. For all the purposes of this case, they were operating that road lawfully ; and if an illegal operation would not be sufficient under s. 18 of the act of 1883, nothing more than a legal one is made necessary by that section.

If the lease was subject to the condition that the lessors or lessees should lease or unite with some other road for the purpose of forming a continuous line, the union of the Montreal and White Mountains roads was a compliance with the condition. That union is within the literal meaning of the requirement, and no ground has been suggested on which it can be held not to be within the legal meaning. The reason that induced the legislature to accept extension as compensation for loss of competition is not stated in the act, and none that can be fairly inferred is competent and sufficient evidence of any other condition than a union or lease for the purpose of forming a continuous line. The adequacy of the compensation is not submitted to the court, but is settled by the statute. The legislature have not stipulated that the region losing the benefit of competition shall receive the benefit of extension. In such public benefits there are no vested private rights that affect the construction of this act. If, upon an investigation of the facts, we should be of opinion that the compensation in this case is inadequate, or does not accrue to the territory losing the advantage of competition, or that in every possible lease there would be a compliance with the condition, such an opinion could not impose a qualification which the legislature have chosen to omit. There is probably no jurisdiction in which a legislative purpose is carried into effect by a more liberal mode of construction than that which prevails in this state. But the most liberal construction is nothing more than the ascertainment of that purpose from competent evidence. Here is no evidence of a condition at variance with, or in expansion of, the ordinary and natural meaning of a continuous line formed by a union or lease. This suit is an exercise of corporate power acquired by persons who bought a controlling amount of Montreal stock for the purpose of taking the road from the lessees and uniting it, by lease or otherwise, with the Concord. The evidence shows the Concord have been advised that the formation of a continuous line by the union of the Montreal and the Concord would legalize the union of the Concord and the Manchester & Lawrence. This advice gave the legal construction of the proviso, which may have been designed for that or some other special case, without regard to its effect as a general clause applicable to other cases. If the design was to require something more than the formation of a continuous line by a lease or other union, the act does not show what other condition the legislature intended to impose.

The road of the lessees need not adjoin that of the lessors. On this point, and in relation to the foreign authority of a foreign company, the act is silent. An intention to require contiguity of roads, or to make foreign authority a condition of New Hampshire's assent, is not proved by competent evidence. The validity of the lease is not disputed by stockholders of the Lowell.

The lease of the Montreal to the Lowell complied with all the terms prescribed by law as conditions of the state's assent. Neither the state, nor any Montreal stockholder who voted for the lease, can maintain a suit to set it aside. If all the stockholders had voted for it or assented to it, this bill would be dismissed because neither they nor the corporation could complain of their own act. If the lease had been contrary to public policy, that is, had been contrary to the will of the state as a party in interest, and abatable at the suit of the state, there would have been a question whether a bill seasonably brought by the lessors could be sustained. But the lease is not contrary to public policy in the sense in which those terms are commonly used in this connection. If it is illegal, its illegality does not extend beyond its violation of the partnership contract of the Montreal stockholders; and of that violation the objecting minority alone could complain. The lease being allowed and approved by the state, so far as legislative power can allow and approve it, nobody can object but a dissenting party in interest, or some one representing him and acting in his behalf, because nobody else is aggrieved. This is a private suit, in which no one has a right to be heard who is not interested in the decree. *Central Railroad Co.* v. *Collins*, 40 Ga. 582, 616. Neither the state, the corporation, the majority of the stockholders who voted for the lease, nor their assigns can contest the lease which they or their assignors made or authorized to be made. Whether the suit could be maintained if seasonably brought in the name of the corporation as a representative of the dissenting minority, we need not now inquire. The bill stands no better than it would if brought by that minority in their own names as sole plaintiffs, after a refusal of the corporation to act for them.

If the suit could be regarded as brought by or for the minority, it could not be maintained. The bill was filed April 22, 1887. It alleges that the lease was approved by a vote of the stockholders June 12, 1884, and that it was executed June 19, 1884. When the minority had knowledge of the vote or the lease, they would waive their claim for equitable relief by not prosecuting it with equitable expedition. The suit was brought nearly three years after the lease was made. During that time the lessees became extensively involved in obligations and liabilities incident to the business of running the leased road. The delay needs explanation, and none is given. It is said the minority supposed the question of the validity of a lease of another road would be settled in *Dow* v. *Northern R. R.* The supposition is irrelevant.

It does not account for their inaction.　They may have hoped, or even expected, that if Dow prevailed against the Northern lease, the Montreal lease would be surrendered without suit.　But it was not a hope or expectation of the result in the Northern case that induced them to refrain from litigation.　It was for a very different reason that they did not resort to the law.　A suit prosecuted in their name, by and for the benefit of others having no legal cause of action, would have been unavailing; and there is no presumption that they would have allowed themselves to be mere nominal plaintiffs.　A suit prosecuted by themselves, in their own name or in any other name, for their own benefit and at their own expense, is a step they have never intended to take. The agreement, in pursuance of which eighteen other persons bought stock of the majority for the purpose of controlling the corporation and contesting the lease, is dated May 20, 1886, nearly two years after the date of the lease.　The defence of the partnership rights of the minority was not among the objects for which that purchase was made, and for which this suit was brought.　Were it possible to treat the minority as plaintiffs in interest, it would remain impossible to find that the Northern case was the cause of this or any other suit not being brought by or for them at an early day.　Assuming that the suit is theirs, they were bound to know that a delay of nearly three years would raise, in the equity jurisdiction, a question of laches that was not raised in the Northern case.

The delay does not destroy the minority's cause of action, if they had one, but it affects the number of their remedies.　If they have a grievance, they have a right of action at law against the Montreal company for violation of their partnership contract.　In such an action against the lessors, they can recover all the damages to which they are entitled.　Their right to the additional redress of an injunction that would enforce specific performance of the partnership contract is a question of justice.　*Eckstein* v. *Downing*, 64 N. H. 248, 259.　If they desired the cumulative remedy in equity, they should have done equity by applying for it promptly.　The question is, not whether their delay comes within a technical rule of estoppel, but whether it was unreasonable.　It was not equitable that they should leave the lessees exposed to the railway risks and controversies arising during two successive lawsuits.　Reasonable diligence did not permit the Montreal minority to wait for the decision of the Northern case. They did not know that all the answers that would be made to this bill would be disposed of by that decision.　More than one defence is set up here that was not presented in the Northern case; and the consequences of an unwarranted assumption that the defences would be the same in both cases cannot justly be put upon the lessees.　As this action was not seasonably begun to contest the original validity of the lease, it is not necessary to exam-

ine the partnership contract of the Montreal stockholders to ascertain whether the lease is a violation of it.

Of the contract in regard to rent, the construction most unfavorable to the lessees is, that they are to pay a maximum sum, fixed in the contract, unless they show, in a prescribed manner, that a less sum is the result of a certain computation upon the gross receipts of the Northern and four other roads: but a minimum is also fixed below which the rent cannot be reduced. There has been no breach of the express covenant to pay rent, or the express agreement to render to the plaintiffs a statement of the gross receipts of the five roads, or the express covenant that books and accounts relating to the business of the five roads shall be open to the plaintiffs' inspection. But the lease of the Northern and its branches to the defendants has been judicially annulled; and the plaintiffs contend that upon the validity and continuing existence of that lease the Montreal lease was made dependent. If the parties had intended this lease should terminate in case the Lowell voluntarily or involuntarily ceased to operate or control the Northern, their accidental failure to put that important part of their contract in the lease could have been cured in a suit for the reformation of the defective instrument. In the lease there is no express stipulation of that kind, and no evidence on which it can be found that such a condition (which would naturally be expressed in direct and distinct terms) was intentionally left to be implied from the mode in which the lessees are to ascertain and show the amount of rent to be paid if they seek to avoid the payment of the largest sum named in the contract. It is not a necessary or a reasonable inference that the inability of the lessees to prove their right to hold the road on payment of a less sum would extinguish their right to hold it on payment of the maximum. If the writing is construed literally, the plaintiffs have no cause of complaint. They do not claim that they have received less rent than was due, or that the statement of the receipts of the five roads has not been rendered, or that "all books and accounts kept by it (the Lowell corporation) relating to the operation of the demised premises and the business of the other roads herein named, so far as may be necessary and proper in determining the gross receipts whereby the amount to be paid as rent is to be ascertained" have not been open to the plaintiffs' inspection. The letter of the written contract does not require that the defendants shall operate or control the Northern, or be able to render the statement without the consent of the operators of the Northern, or that any books or accounts not kept by the defendants shall be open to the plaintiffs' inspection. And upon the intention of the parties legally proved by the evidence contained in the lease, the plaintiffs have no stronger position than upon the letter of the document. There is no evidence and no reason to believe, that the statement of receipts and the opportunity to inspect books and accounts were to be given for

any other purpose than to furnish means of information on the question of the amount of rent to be paid if the defendants should raise that question by not paying the maximum. Whether a strict interpretation is accepted without looking for the intention of the parties, or their words are weighed as evidence of what they meant, the result is the same. The lease of the Montreal was not made dependent upon the validity and continuing existence of the lease of the Northern.

                                          *Bill dismissed.*

All concurred.

The substance of the second bill (filed March 30, 1888) is stated in the opinion.

[ANSWER OF THE BOSTON & MAINE RAILROAD, FILED JUNE 1, 1888.]

This defendant, reserving to itself the benefit and advantage of any exceptions to the plaintiff's bill, which can or might be taken by special or formal demurrer, or otherwise, for answer thereto saith as follows, to wit,—

I. It admits that the plaintiff, on the 19th day of June, 1884, was in possession, either as owner or lessee, of the railroads and branch railroad described in the plaintiff's bill; that prior to June 12, 1884, the directors of the plaintiff and of the Boston & Lowell Railroad corporation made an agreement for a lease of the plaintiff's several railroads to said Boston & Lowell Railroad corporation; that after said agreement, and pursuant thereto, the directors and stockholders of the plaintiff severally voted as stated in said bill, agreeing to and approving of a lease by the plaintiff to said Boston & Lowell Railroad corporation of the tenor and terms of a copy of an indenture of lease made part of said plaintiff's bill; that said indenture of lease was duly executed on behalf of the plaintiff and said Boston & Lowell Railroad corporation; that possession under said lease was given by said plaintiff, and assumed by said Boston & Lowell Railroad corporation, June 19, 1884, and has continued as alleged in said bill until October 11, 1887, and as hereinafter alleged by this defendant, has ever since continued, and still continues; that said Boston & Lowell Railroad corporation surrendered possession of the Northern, Concord & Claremont, and Peterborough & Hillsborough railroads, July 1, 1887, pursuant to a decree of court; that on the 22d day of June, 1887, this defendant made a contract of lease with said Boston & Lowell Railroad corporation, a portion of the provisions of which the plaintiff undertakes to set out in its said bill, but all the provisions of which are contained in a true copy of said contract, marked "A," hereto annexed and made part of this answer; that on the 18th day of November, A. D. 1887, the

plaintiff entered upon the premises described in its said lease to said Boston & Lowell Railroad corporation, assuming and undertaking to do so for the purpose of determining the estate thereby granted for an alleged breach of certain conditions of said lease, as appears by the copy of a written instrument executed simultaneously with said entry, a copy of which is hereto annexed marked " B," and made part of this answer; that on the 29th day of November, A. D. 1887, the plaintiff brought a suit at law against this defendant, now pending in this court, but which suit is not for the recovery of the plaintiff's said railroad and railroad property as alleged in said bill, but only for a portion thereof—as fully appears of record; that in contracts of lease between said Boston & Lowell Railroad corporation and said Stony Brook and Wilton railroads, respectively, the said Boston & Lowell Railroad has covenanted with each of those corporations that it would not assign, underlet, or part with the possession of the leased premises without the written consent, in each case, of the lessor; and that the operating expenses and fixed charges of the plaintiff's railroad since said October 11, 1887, have exceeded the earnings thereof, and that such excess has been paid by this defendant.

II. It denies, except as herein admitted, each and every allegation of the plaintiff's bill as fully and particularly as if the same were herein repeated and specifically denied.

III. It specially denies that it has ever intended or contrived to acquire possession of the plaintiff's railroads, except with the plaintiff's assent; that it has ever threatened to hold, or is now holding or operating, the plaintiff's railroad; that from April 1, 1887, to October 11, 1887, it managed and controlled the Boston & Lowell Railroad corporation, or any part thereof, or any of its leased lines, including the plaintiff's railroads; that after October 11, 1887, it operated, or continued to operate, the roads of the plaintiff, except as hereinafter alleged and stated, or the Stony Brook and Wilton railroads; that said Boston & Lowell Railroad corporation, on said 11th day of October, 1887, or at any time since, has ceased to exist as a manager, controller, or operator of any railroad property, or has voluntarily deprived itself of rolling-stock, equipment, and other property necessary for the operation of a railroad; that since said 11th day of October, 1887, said Boston & Lowell Railroad corporation has received no money or income except its semi-annual dividends and its organization expenses, as paid to it by this defendant; that since October 11, 1887, said Boston & Lowell Railroad corporation has expended no money except for dividends and organization expenses; that said Boston & Lowell Railroad corporation, under its contract of lease with this defendant, does not expect to receive, and cannot receive, any money or income except for its dividends and organization expenses, as aforesaid, to be paid by this defendant; that on said 11th day of October, 1887, said Boston & Lowell Railroad corporation turned over to this

defendant all its railroad, railroad property, and contracts with other railroads, including the plaintiff's lease of June 19, 1884, and at said time discharged and turned over to this defendant all its officials and employés (except its directors, president, and treasurer), and quitted the business of operating railroads ; that the consent of the plaintiff, or of said Stony Brook and Wilton railroads, respectively, to an assignment to this defendant of the lease of each of said railroad corporations to said Boston & Lowell Railroad corporation, has never been asked or granted ; that on said 11th day of October, 1887, or at any time since, this defendant took, or has taken, possession of the road of the plaintiff, or has operated the same through officials duly appointed by it for that purpose, or on said 11th day of October, 1887, took possession of said Stony Brook and Wilton railroads, and has ever since possessed and operated the same, except as hereinafter alleged and stated ; that said Boston & Lowell Railroad corporation has no officers or employés for operating any railroad ; that all the officials and employés now, and since October 11, 1887, engaged in operating said three roads, have been, and are, hired by said Boston & Maine Railroad, and paid from its treasury ; that all gross income received from each of said three roads since October 11, 1887, has been turned into the treasury of the defendant, and the operating and other expenses of said three roads been paid therefrom ; and that under the lease between this defendant and said Boston & Lowell Railroad corporation of June 22, 1887, all the future income of the plaintiff and said Stony Brook and Wilton railroads, for ninety-nine years from April 1, 1887, is to be taken by this defendant, and all operating and other expenses of said three roads to be paid by it during said term.

IV. It specially denies each and every allegation of fraud, of unfair dealing or misrepresentation, of suppression of facts, and of the employment of fictitious business, machinery, and methods in the plaintiff's bill contained, as fully and explicitly as if each allegation were here repeated and specifically denied, and denies that at any hurriedly called conference of officers of the defendant, or at any other conference, it was agreed that any fictitious machinery and methods had been used by the defendant for keeping possession of and operating the plaintiff's railroad, or were dangerous and unsafe ; that the defendant must provide other and more deceitful and delusive methods and machinery for operating and retaining the possession of the plaintiff's railroad ; that thereupon, and for said purposes, the defendant invented and adopted new machinery and methods, and a separate organization of heads of departments and superior officers, to be deceitfully appearing to operate the plaintiff's railroad for and in behalf of said Boston & Lowell Railroad corporation ; and that thereupon either the circular of November 5, 1887, or any other circular, was fraudulently dated and issued by this defendant.

V. It specially denies that since the taking possession of the plaintiff's railroads (alleged by the plaintiff, but denied by the defendant) under said lease of June 19, 1884, it has permitted the plaintiff's property to depreciate; that the bridges on said line have become unsafe, or that the road-bed, or the ties and rails belonging thereto, have not been kept in proper repair; that engines, cars, and other equipment used on the plaintiff's railroads are unsafe or unsuitable for the proper operation of said road; that new locomotives and new steel rails are absolutely required; that all locomotives now in use on said road are unfit for use, and ought to be sent to the shop for repairs; that the station-houses and buildings on said road are ruinously out of repair; and that a large sum of money, to wit, two hundred and fifty thousand dollars ($250,000), ought to be expended upon said railroads in renewals and repairs, in order to make the same safe and convenient for the public travel upon them.

VI. It alleges that the lease of the roads of the plaintiff to said Boston & Lowell Railroad corporation, by indenture dated June 19, 1884, was duly agreed to by the directors of said Boston & Lowell Railroad corporation, and approved of by its stockholders conformably to, and as authorized by, the laws of the state of Massachusetts; that said Stony Brook and Wilton railroads are operated under contracts between the Nashua & Lowell Railroad company and said Wilton and Stony Brook railroad companies, respectively, dated May 6, 1872, May 28, 1860, and October 26, 1868, and by this defendant as agent and attorney of said Nashua & Lowell Railroad company; that neither itself nor said Boston & Lowell Railroad corporation have done anything as respects the plaintiff or its property, except openly and *bona fide*, and pursuant to the provisions of the public contract of lease between them of June 22, 1887, hereinbefore referred to; and that the epithets profusely applied to the defendant and its conduct, throughout the plaintiff's bill,—such as "subterfuge," " equivocation," " secretly," "clandestinely," "fictitious," "deceitfully," "falsely," "delusively," "fraudulently," "cheating,"—are impertinent and irregular as matter of pleading, and as matter of argument are wholly without justification in the facts, even as alleged by the plaintiff itself.

VII. It alleges that the said Boston & Lowell Railroad corporation has never surrendered possession of the plaintiff's railroad or any part thereof; but, pursuant to the covenants of its lease to the defendant of June 22, 1887, has remained in possession thereof, and operated the same in all respects conformably to said contract, retaining for that purpose the necessary material, supplies, equipment, money, and other property, and receiving the gross income thereof.

VIII. It alleges that the plaintiff's railroads, the road-bed thereof, and the rolling-stock and equipment used thereon, are

not only in no worse condition than the same usually are at the end of the winter season, but are in better condition than they customarily have been at the same season of the year; that the said Boston & Lowell Railroad corporation is now making such substantial and thorough renewals and repairs upon the plaintiff's roads and the equipment used thereon, as are always made at the opening of the summer season, and as will enable them to be operated with safety and efficiency; and that since the plaintiff's railroads have come into its possession the said Boston & Lowell Railroad corporation has expended in new bridges, steel rails, on station building, water-tanks, turn-tables, and other permanent betterments on the plaintiff's said railroads, more than two hundred and fifty thousand dollars ($250,000); so that the plaintiff's railroad property, instead of having depreciated while in the possession of said Boston & Lowell Railroad corporation, has largely enhanced in value, as well as in its capacity and fitness for use in the business of railroad transportation.

[ANSWER OF THE BOSTON & LOWELL RAILROAD, FILED JUNE 1, 1888.]

This defendant, by leave of court and agreement of parties, appears in the several suits in which the Boston, Concord & Montreal Railroad is plaintiff, now pending in the supreme court in the state of New Hampshire, and mentioned in the agreement of May 7, 1888, between the Boston, Concord & Montreal Railroad, the Boston & Maine Railroad, and the Boston & Lowell Railroad corporation, and makes the following additional answer to said several suits in which either it or the Boston & Maine Railroad is the defendant:

The said defendant, insisting that the plaintiff is not entitled to the relief prayed for, and reserving all rights, privileges, or advantages to which it would be entitled under a special or formal demurrer to plaintiff's bill of complaint, reaffirms the allegations contained in its original and amended answers to the plaintiff's bill of complaint formerly filed in the supreme court of said state of New Hampshire, in the eastern judicial district for the county of Grafton, on the 22d day of April, A. D. 1887, and referring to the same as part of this answer, reiterates the denials and allegation therein contained; and in further answer to the bill of complaint of said plaintiff, against the Boston & Maine Railroad, filed in the said supreme court within and for the county of Merrimack in said state, March 30, 1888, to which it has become a party defendant by leave of court and by said agreement, it says,—

1. That on the 19th day of June, 1884, the plaintiff was the owner of or in possession of the railroad described in its said bill of complaint, and that on said 19th day of June, 1884, the plaintiff corporation executed to this defendant, in pursuance of the

agreement and votes alleged in the plaintiff's bill, a valid lease of all its said railroad property, a copy of which lease and the votes relating thereto are hereunto annexed and made a part hereof (Exhibit A); and this defendant avers that the parties to said lease were duly empowered and authorized by law and by the votes of said corporation to make and execute the same, and this defendant was specially empowered to take said lease, and that said lease contained the covenants and agreements appearing in said Exhibit A, a part of which are set out in the plaintiff's bill of complaint; but this defendant denies that the stockholders of said plaintiff corporation ever protested against or objected to said lease, except that at the special meeting holden at Plymouth, June 12, 1884, persons owning 410 shares of stock voted against the approval of said lease, but that since June 12, 1884, the stockholders of said corporation, by receiving rent and accepting the benefits arising under said lease, have acquiesced in and ratified the same; and that until commencement of these said proceedings no objections other than above have ever been made to said lease; and this defendant says it has been permitted to make large expenditures upon the rolling-stock and railroad and other property leased to it by said plaintiff without objection from said plaintiff, but with its consent and at its request; and that the plaintiff is, and in equity should be, estopped from setting up any want of formality or legality in the execution of said lease.

2. That in accordance with the provisions of said lease, this defendant took full possession and control of said leased railroad and property, including the Pemigewasset Valley Railroad, and held, operated, and controlled the same in accordance with the agreements and covenants of said lease, not only from said 19th day of June, A. D. 1884, until October 11, 1887, as alleged in the plaintiff's bill, but has possessed, operated, and controlled the same from said October 11, 1887, to the present time, and still continues to possess, operate, and control said leased property in accordance with the terms of said lease, and has ever continued to faithfully keep and perform every covenant, agreement, and undertaking contained in said lease to be by it kept and performed, and has in no manner violated said lease nor any of the covenants and agreements therein contained. This defendant further alleges, that it has greatly improved said property and added to the business done over said railroad, and by its expenditure of money has permanently improved said railroad and leased property, and that by its effort said property has become of much greater value and efficiency for the transportation of passengers and freight than it was before and at the time said lease was made.

3. This defendant further says, that it is true that on the 22d day of June, 1887, it executed to the Boston & Maine Railroad a lease of its railroad and property, a copy whereof is hereunto annexed, marked Exhibit B, and made a part of this answer; and

it alleges that said lease was authorized by law and by the votes of the stockholders and directors of the parties thereto, and that in pursuance of said lease, on the 11th day of October, 1887, it transferred to the Boston & Maine Railroad the possession of the railroad and property of which it was the absolute owner, and of which it had the legal right to transfer the possession, and of which the said Boston & Maine Railroad had the legal right to take the possession. This defendant further alleges, that it did not and never has assigned or underlet or parted with the possession of the premises demised to it by the plaintiff by its lease of June 19, 1884, marked Exhibit A, either to the Boston & Maine Railroad, or to any other corporation or person, and has not parted with the control thereof, but still possesses, operates, and controls the same in accordance with the provisions of said lease. It also alleges that at the time of said lease to the Boston & Maine Railroad, and ever since, it reserved and still reserves and possesses sufficient rolling-stock, equipment, and other means with which to operate said railroad and property leased of the plaintiff as aforesaid, and it has retained under its direction a sufficient number of officers and employés to control and operate said demised railroad and property, in strict conformance with said lease of June 19, 1884.

4. This defendant denies the allegations in said bill of complaint relating to the motives and purposes of said lease to the Boston & Maine Railroad; it denies that said lease, or any clause or covenant thereof, was made for the purpose of allowing the Boston & Maine Railroad to acquire, against plaintiff's consent, the railroad mentioned in said plaintiff's lease marked Exhibit A, or to acquire any of plaintiff's property by "subterfuge, equivocation, and quibble," as alleged in plaintiff's bill. It denies that said Boston & Maine Railroad either threatens to hold, or is in fact holding, operating, or controlling, the railroads mentioned in plaintiff's lease marked Exhibit A, and in violation of said lease, and that this defendant has no interest in or to said leased property, or possession thereof, as alleged in said plaintiff's bill.

5. This defendant admits that it surrendered possession of the Northern, Concord & Claremont, and Peterborough & Hillsborough railroads, July 1, 1887, pursuant to a decree of the supreme court of the state of New Hampshire, but this defendant alleges that it has ascertained and paid to the plaintiff the full amount of rental provided for by said lease marked Exhibit A, and it alleges that the fixed charges of the plaintiff's railroad, named in said lease, Exhibit A, have, since the eleventh day of October, 1887, exceeded the earnings thereof, and that such excess has been paid for the plaintiff. It alleges that said Stony Brook and Wilton railroads are operated under contract between the Nashua & Lowell Railroad corporation and said Wilton and Stony Brook companies respectively, dated May 6, 1872, May 28, 1860, and October 26,

1868, and that if the Boston & Maine operates said railroad or either of them, it does so as the attorney of said Nashua & Lowell Railroad, and that such operation does not affect the rights of the plaintiff in any manner whatsoever, and it denies the allegations in relation thereto as set out in the plaintiff's bill.

6. This defendant denies, except as herein otherwise stated, each and every allegation in the plaintiff's bill as fully and particularly as if the same were herein set out and specifically denied, and especially it denies that there was any pretence, or suggestion, or fraud, or concealment in relation to the management of the several properties and railroads mentioned in the plaintiff's bill, or that the same were privately or clandestinely managed or controlled by the Boston & Maine Railroad under the cover and in the name of the Boston & Lowell Railroad as therein alleged, or for the purpose therein set forth; it denies that at any time since October 11, 1887, or before that time during its existence, this defendant has ceased to exist as a manager of all railroad property, or that it has deprived itself of rolling-stock, equipment, and supplies necessary for the operation of a railroad; it denies that since the 11th day of October, 1887, it has received no money or income from any source for its own use, excepting its dividends and organization expenses, and that it has expended no money since said date for any purpose except that received from dividends and organization expenses, and that it cannot receive from any source money, cash, or income except from the treasury of the Boston & Maine Railroad for the term of ninety-nine years, as alleged in said bill; it denies that it has turned over to the Boston & Maine Railroad its railroad and property of every kind and description, including the premises leased of the plaintiff, and has discharged and turned over to the Boston & Maine Railroad, its officials and employés, excepting its president, directors, and treasurer, and has quit the business of operating railroads, as alleged in said plaintiff's bill; it denies the allegations contained in the plaintiff's bill that there was any pretence in the operation of any of the railroads therein named, or that there was any purpose to deprive the plaintiff of its property and its rights, or to cheat the plaintiff, the public, and the court, as alleged in said bill; it denies that this defendant has ceased to be a corporation, that it is the pretended agent and servant of the Boston & Maine Railroad, that it is a corporation without officers, employés, cash, or resources, that it is helpless to use its own name in this proceeding, except at the bidding of the Boston & Maine Railroad, as is impertinently, arrogantly, and scandalously alleged in the plaintiff's bill, and alleges that such allegations are neither pertinent nor proper in a proceeding of this character; it denies that there are any fictitious business machinery and methods adopted by it or the Boston & Maine Railroad for the purpose of concealing the real possession of the railroad leased of the plaintiff, or that by false and deceitful methods of machinery the Boston & Maine Rail-

road operated and possessed the plaintiff's railroad for one month or for any other time; and it denies that it ever consented or authorized any warning to be given to the Boston & Maine Railroad, as alleged in plaintiff's bill; it denies that its chief officials ever did give such warning; it denies that there were any deceitful and delusive methods of machinery ever invented or used for the operation and possession of the railroad leased of the plaintiff, as alleged in the plaintiff's bill; it denies the allegations relating to the invention and construction of new machinery and methods relating to the operation of said railroads leased of the plaintiff, as alleged in plaintiff's bill, or that any officers were fictitiously appointed therefor, and alleges that due and proper measures have been taken to control and operate the roads leased of the plaintiff in accordance with the provisions of said lease, and that this defendant has taken especial care not to part with the possession and operation of said road, or permit any violation of the clause of said lease in relation thereto. And this defendant is not advised, and therefore denies the claimed admissions of the Boston & Maine Railroad, as alleged in said bill; and alleges that if such admissions have been made, this defendant is in no way bound thereby.

This defendant admits that on the 18th day of November, 1887, the plaintiff entered upon the railroad described in the lease of June 19, 1884, claiming a breach of the covenant of said lease, that this defendant " will not assign or underlet the premises hereby demised, or part with the possession thereof, except with the written consent of the first party (the plaintiff)," for the purpose of determining the estate created by said lease, but it denies that by such entry the estate or rights of this defendant under said lease were determined and divested, and that notwithstanding such entry, the Boston & Maine Railroad, in violation of the covenants of said lease, unlawfully, and without right, retained possession of the railroads and railroad property named in said lease, and now unlawfully, and without right, holds the same as alleged in said bill.

This defendant admits that on the 29th day of November, 1887, the plaintiff brought its suit at law against the Boston & Maine Railroad for the recovery of a part of the railroad and property of the plaintiff named in said lease, to wit, that part situated in the county of Merrimack in the state of New Hampshire.

7. This defendant specially denies that since taking possession of the plaintiff's road, named in the lease of June 19, 1884, it voluntarily deprived itself of the power to perform any of its covenants; that it has permitted said railroad property to depreciate in its general condition so as to be unsafe or hazardous for the public to travel upon; that the bridges on said railroads have been improperly neglected, and permitted to become unsafe and unsuitable for the engines and cars doing the business over said railroad; that

the ties and rails of said railroad have not been renewed and kept in repair according to the covenants of said lease and the demands of public travel and the business thereon; that the rolling-stock, equipment, engines, and cars used upon said railroad are insufficient for the business of said road, and are unsafe, and are in an unsuitable condition of repair; that every locomotive now in use on said road ought, in the proper management of said railroad, to be sent to the shop for repairs; that new locomotives and rails, other than those from time to time furnished, are an absolute necessity for said railroad; that the station-houses and buildings on said railroad are ruinously out of repair, and that two hundred and fifty thousand dollars, or any sum of money over and above what this defendant is to furnish or cause to be furnished, is necessary to be expended on said railroads in renewals and repairs, in order to make the same suitable for doing the business thereof, and that the public safety and convenience, and the preservation of said railroad and property, demand any such expenditure as alleged in said bill.

And this defendant alleges that said railroad and property is in no worse condition than what would be reasonably expected, regard being had to the condition of the road when leased and the rigorous nature of the winter just ended, and that this corporation is now making such repairs as are necessary for the reasonable improvement of said road and as are sufficient to make it safe and convenient for the accommodation of summer travel and business to be done over the same; and it further alleges, that since its lease of said railroad it has greatly improved the same; that at the time of said lease said railroad was so out of repair as to be unsafe; that in many instances it has renewed bridges and relaid rails, put on new equipment and rolling-stock, and increased the efficiency of said road and the business thereon; it has repaired, painted, and improved the stations along the line of said road, and greatly added to the convenience of the public having occasion to use the same; and in these improvements it has expended a sum upward of two hundred and fifty thousand dollars, all of which has been received by the plaintiff corporation and its directors without objection or sign of dissent.

It denies that the Boston & Maine Railroad has obtained possession of said railroad and property, named in the lease of the plaintiff, by trickery, fraud, or in any other manner, and that said road is permitted to waste and deteriorate from any cause, and that great and irreparable loss of property and business must result unless the relief prayed for is granted, as alleged in said bill. And this defendant denies all allegations of trickery, fraud, secret combinations, unlawful action, cheating, and like charges contained in said bill, and alleges that said allegations are without justification, and that said plaintiff is not entitled to the relief prayed for in said bill.

Doe, C. J.   In the second bill the lessors seek to enforce a forfeiture of the estate conveyed by the lease, alleging that the lessees have assigned and underlet the road, and parted with its possession, in breach of covenant.   No reason appears why the question of forfeiture should not be settled in the pending suit at law, or why it should be settled in chancery.   *Walker* v. *Walker*, 63 N. H. 321,328.   The plaintiffs also ask the appointment of a receiver to take possession of the road and run it during litigation, because of the alleged failure of the operators to keep it in suitable repair.   If there were no responsible persons able and legally compellable to perform this duty, the road might be in such a ruinous and dangerous condition as to require a receiver.   But the Lowell company are responsible persons, claiming to be the operators, acknowledging their duty, and compellable by process of law to do it upon their claim.   It is not necessary in this case to inquire whether the Lowell or the Maine are the operators. And there is no occasion for the law to assume, through a receiver, the duty of repair which a responsible company can be legally compelled to perform.

*Bill dismissed.*

All concurred.

In the Suit at Law, Boston, Concord & Montreal Railroad *v.* Boston & Maine Railroad and Boston & Lowell Railroad, the writ is as follows:

The State of New Hampshire.

[L. S.]      Merrimack ss.

*To the Sheriff of any County or his Deputy :*

We command you to summon the Boston & Maine Railroad, a corporation duly established by law, and doing business at Dover in our county of Strafford (if to be found in your precinct), to appear before the supreme court, to be holden in Concord in said county of Merrimack on the first Tuesday of April next, to answer to the Boston, Concord & Montreal Railroad, a corporation duly established by law, and doing business at Concord aforesaid,—

In a plea of land wherein the plaintiff demands of the defendant a certain tract of land situated in said county of Merrimack, and being that tract of land extending from a point in said Concord, through said Concord and the towns of Canterbury and Northfield, to a point in the line between said county of Merrimack and our county of Belknap, and being all the land within said county of Merrimack on which the railroad of said plaintiff corporation is located and constructed, together with said railroad and all the lands, stations, and buildings used or occupied for railroad purposes upon or along said route in connection therewith, and all right of way and easements appurtenant thereto ; whereupon the

plaintiff says that it was lawfully seized of the demanded premises, with the appurtenances in its demesne as of fee within twenty years last past, and ought now to be in quiet possession thereof; but the said defendant has since unjustly entered and holds the plaintiff out.

Also, in a further plea of land, wherein the plaintiff demands of the defendant a certain tract of land, being all the land described in the first count above written, together with the railroad, right of way, buildings, and appurtenances therein described; whereupon the plaintiff complains and says that within twenty years last past it was seized of the demanded premises in its demesne as of fee, and being so seized heretofore, to wit, on the 19th day of June, 1884, it executed and delivered to the Boston & Lowell Railroad corporation, a corporation existing by virtue of the laws of the commonwealth of Massachusetts, a certain indenture of that date, wherein it leased and demised to said last named corporation the land, railroad, right of way, buildings, and appurtenances aforesaid, together with other land and railroad property, for a term of ninety-nine years from and after the first day of June, 1884, reserving to itself a certain rental during said term; and wherein said last named corporation covenanted and agreed with the plaintiff, among other things, that it would not assign or underlet the premises demised as aforesaid, or part with the possession thereof, except with the written consent of the plaintiff; and further, that in case of a breach of said last named covenant and agreement, the plaintiff might enter upon and take full possession of said demised premises, and all depots, shops, buildings, tracks, and other permanent property demised as aforesaid, and remove said Boston & Lowell Railroad corporation and all persons claiming under it from said premises, and thereby determine the estate granted as aforesaid, using whatever force might be necessary for that purpose. And the plaintiff further says, that upon the execution and delivery of said indenture as aforesaid the plaintiff delivered to said Boston & Lowell Railroad corporation said demised premises to hold under and in pursuance of said indenture, and in no other way; that thereafterwards, to wit, on the first day of November, 1887, the said Boston & Lowell Railroad corporation, in violation of the covenants and agreements aforesaid to be kept and performed by it, and without the written consent of the plaintiff, and without right (all of which the defendant well knew), assigned said demised premises, including said railroad, right of way, buildings, and other appurtenances, and delivered possession of all the same to the defendant; that thereafterwards, to wit, on the eighteenth day of November, 1887, at said Concord, the plaintiff entered upon said demised premises, depots, shops, buildings, tracks, and other permanent property demised as aforesaid, for the purpose of taking full possession thereof and determining the estate granted as aforesaid; that by virtue of the

covenants and agreements aforesaid contained in the said indenture, and the assignment by said Boston & Lowell Railroad corporation to the defendant of said demised premises, and the delivery of possession of all the same to the defendant as aforesaid, and the entry by the plaintiff as aforesaid, the term and estate granted by said indenture determined and became forfeited, and the plaintiff thereupon became, and is now, entitled to the full and peaceable possession of all said demised property; but the defendant declined to yield such possession to the plaintiff, and still claims said estate and the possession of said demised premises under said indenture. Wherefore the plaintiff prays judgment establishing the determination and forfeiture of said term and estate, and for a writ of possession and other process for executing said judgment, defending its rights, and giving it the relief to which it is by law entitled.

To the damage of the said plaintiff (as it says) the sum of five hundred thousand dollars; and make return of this writ with your doings therein.

Witness: Charles Doe, Esq., the twenty-ninth day of November, Anno Domini 1887.

                                   A. J. Shurtleff, *Clerk.*

June 19, 1884, the Boston, Concord & Montreal Railroad executed a lease of its road, etc., to the Boston & Lowell Railroad, wherein it is recited that

"Whereas, said first party has agreed to grant, and said second party has agreed to take and accept, a lease of said railroad of the first party, upon the terms and conditions hereinafter set forth:

"Now, therefore, said first party, in consideration of the rent, covenants, and agreements hereinafter mentioned, to be paid, kept, and performed by the second party, has leased and demised, and does hereby lease and demise, unto said second party the railroad of said first party, extending from Concord, New Hampshire, to Groveton Junction in said state, and the branch railroad from Wing road, so called, to the base of Mount Washington in said state, as said railroad and branch are now located and constructed, together with all the lands, stations, and buildings used or occupied by said first party for railroad purposes upon or along said route, and all the right, title, and easement of said first party in and to the lands lying within or without the limits of the location of said railroad, and the use thereof, with full right and authority to said second party to hold and use said rights, easements, and privileges as fully as said first party might or could if these presents had not been executed, a plan of which lands and location accompanies this lease, said demised premises being subject to the mortgages on the same.

"To have and to hold to said second party for and during the term of ninety-nine years from and after the first day of June, 1884,

RAILROAD v. RAILROADS.

[Merrimack,

the said second party yielding and paying unto said first party the rent hereinafter mentioned, and keeping and performing all the covenants and agreements of said second party hereinafter contained ; but nothing herein contained is intended to operate to the prejudice of, or to.qualify in any manner, the rights or franchises of said first party conferred by its charter ·and the laws of the state of New Hampshire, or to curtail any powers or franchise of said first party, or prevent the exercise thereof in such manner as may be necessary for the protection of the interests of its stockholders."

This lease contained the following stipulations :

" Said first party, being also in possession as lessee of the Pemigewassett Valley Railroad under a certain indenture of lease . . . does hereby make, constitute, and appoint the said second party its agent or attorney to manage and operate said railroad. . . .

" Said second party hereby covenants and agrees that it . . . will operate said leased road. . . .

" Said second party further covenants and agrees, that during the term hereby granted it will, at its own cost and expense, maintain, preserve, and keep the railroad of said first party in as good condition and repair as the same now is. . . .

" Said second party further agrees, that it will, during the term of this lease, operate said railroad and leased road. . . .

" Said second party covenants and agrees that it will not assign or underlet the premises hereby demised, or part with possession thereof, except with the written consent of the first party ; that it will not suffer said railroad of the first party to get out of repair or become depreciated in its general condition, except by the ordinary wear and use thereof, to be made good by renewal as aforesaid.

" And it is further covenanted and agreed by said second party, that in case of breach of any of its covenants herein contained, or in case that the estate hereby created and vested in said second party shall be taken from it by legal proceedings of any kind, or in case of default in payment of the rent above mentioned, if the same or any part thereof shall remain unpaid for a period of thirty days after becoming due and payable, and after demand in writing made therefor, then said first party may enter upon and take full possession of the premises hereby demised, and all depots, shops, buildings, tracks, and other permanent property, and remove said lessee and all persons claiming under it from said premises, and thereby determine the estate hereby granted, using whatever force may be necessary for that purpose ; and said second party agrees that it will not, in such event, hinder or prevent the entry of said first party to recover the possession of said demised premises as of its former estate, and shall account for and pay over the value of the property so assigned and transferred, less such sums as may have been paid to make good the guaranty aforesaid above the twenty-five per cent."

[COPY OF LEASE EXECUTED BY THE BOSTON & LOWELL RAIL-
ROAD AND THE BOSTON & MAINE RAILROAD.]

This indenture, made in duplicate this twenty-second day of
June, A. D. 1887, by and between the Boston & Lowell Railroad
corporation, a corporation existing under and by virtue of the laws
of the commonwealth of Massachusetts, party of the first part, and
hereinafter denominated the " lessor," and the Boston & Maine
Railroad, a corporation existing under and by virtue of the laws of
said commonwealth, and under and by virtue of the laws of the
states of Maine and New Hampshire, party of the second part,
and hereinafter denominated the " lessee,"—

Witnesseth, that the said parties, each for itself, its successors
and assigns, and each in consideration of the grants, covenants,
and engagements herein made by the other, have granted, cove-
nanted, and agreed, and do hereby grant, covenant, and agree,
each to and with the other, and its successors and assigns, as fol-
lows, to wit:

I. The lessor doth grant, demise, and lease unto the lessee, its
successors and assigns, its railroad and railroad property of every
description, including therein its railroad, lands, docks, and
wharves within or without said commonwealth, branches, tracks,
side-tracks, road-beds, superstructure, station-houses, depot grounds,
depots, viaducts, bridges, piers, shops, buildings, fixtures, engines,
cars, rolling-stock, machinery, tools, furniture, telegraph apparatus,
equipment, material, and supplies, and all rights, franchises, ease-
ments, privileges, and appurtenances thereto belonging, together
with the right to demand and receive all tolls, rent, revenue,
income, and profits of the demised premises; including also
therein all the right, title, and interest of the lessor in and to any
and all railroads operated by it, under lease or otherwise, so far as
the same are assignable or transferable by the lessor without vio-
lation of law or of agreement, but not otherwise; and in and to
any stock of other railroads owned by it, all dividends thereon,
and its right of voting on the same; and in and to any bonds,
obligations, and contracts of or with other railroads, corporations,
or individuals, and all income or other advantages and benefits to
be derived therefrom, a schedule of which stock and bonds is here-
unto annexed; hereby assigning and transferring unto the lessee,
subject to all legal obligations and incumbrances thereon, all its
railroad, railroad property, franchises, and assets of every descrip-
tion, except as above stated.

To have and to hold all and singular the demised premises to
the lessee, its successors and assigns, for and during the term of
ninety-nine years from and after the first day of April, A. D.
1887, the said lessee keeping and performing the covenants
herein contained on its part to be kept and performed, and yield-
ing and paying rent for the said premises to the amount and in
the manner following, to wit:

VOL. LXV. 28

1. The lessee shall pay all operating expenses of the lessor, and of all railroads of which it shall come into possession, or which it shall operate under and by virtue of this instrument, there being included therein, as part thereof, all repairs and renewals; all expenditures arising out of any contract, obligation, business, negligence, or misfeasance, or however otherwise arising, and whether the liability for the same now exists, or be hereafter created in any way connected with the use and operation of the demised premises, or of railroads operated by the lessee or lessor, as herein provided, and including damages to persons or property, insurance, all taxes of every description, federal, state, and municipal, upon property, business, franchises, or capital stock; all expenses consequent upon or incidental to the renewal or refunding of the lessor's indebtedness, or that of any road owned, leased, or operated by it; any expenditures hereinafter declared to be operating expenses; and the organization expenses of the lessor, for which, in addition to sufficient office accommodations to be furnished by the lessee at the present station of the lessor in Boston, or at such station as shall be erected in its place, there shall be paid to the lessor, at the end of each successive three months during the term of this lease, the sum of seventeen hundred and fifty dollars ($1,750).

2. The lessee shall pay, as the same become due, the rentals of all railroads of which it shall come into possession, or which it shall operate under and by virtue of this instrument, during the continuance of this lease, and of all roads leased to this lessor according to the terms of the several leases, and the interest on the indebtedness of the lessor and on the indebtedness of all roads leased or operated by the lessor which this lessor is under obligation to pay, a schedule whereof is hereto annexed, and upon such future indebtedness as shall be created for the purposes herein provided, and to that end shall pay to the lessor such sums of money at such times as shall enable it to punctually meet the interest on such indebtedness as the same matures. The lessee shall assume and pay the current expenses and indebtedness upon open account of the lessor outstanding at the date of this lease, and the same shall be accounted for and reimbursed to the lessee at the termination of this lease. The lessor shall turn over to the lessee all cash on hand, outstanding bills, notes, and accounts receivable, and all sums received thereon; and all such cash on hand shall be accounted for and paid over to the lessor without interest, at the termination of this lease.

3. The lessee shall pay to the lessor, on the first day of July, A. D. 1887, the sum of one hundred and ninety-three thousand five hundred and twenty-nine dollars ($193,529), being three and one half per cent. ($3\frac{1}{2}$ per cent.) upon its now existing capital stock; shall pay to the lessor the same sum on the first days of every succeeding January and July until and including the first day of January, A. D. 1897; shall thereafter, on the first days of every suc-

ceeding July and January, during the term of this lease, pay to the lessor the sum of two hundred and twenty-one thousand one hundred and seventy-six dollars ($221,176), being four per cent. (4 per cent.) on its now existing capital stock; and for any portion of any half year, the rent for which remains unpaid at the expiration or earlier termination of this lease, shall pay the lessor rent *pro rata*, at the rate in force at the time of such termination; *provided, also,* that from and after any increase of the lessor's capital stock, as herein provided, the semi-annual payments, to be made as above, shall be increased so that each payment shall be of an amount equal to three and one half per cent. ($3\frac{1}{2}$ per cent.), if before July 1, A. D. 1897, and to four per cent. (4 per cent.) on and after July 1, A. D. 1897, upon all the lessor's capital stock issued and outstanding at the time of such payment.

II. The lessor covenants that, if it be found impracticable to at once deliver immediate possession of any railroad leased or operated by it at the inception of this lease, by reason of any agreement to the contrary, or other reason, it will use all reasonable efforts to deliver, and will deliver, possession thereof as soon as practicable. The lessor shall, meanwhile, continue in the possession of such railroad, and, under the direction of the lessee in all respects, shall continue to use and operate the same under its contract with the company owning the same, and to pay the rental or other consideration agreed to be paid for the use of the same, and to receive the earnings thereof; but shall immediately transfer and pay over all such earnings to the lessee to its own use, which, in consideration thereof, shall reimburse the lessor for all expenditures, and indemnify and hold it harmless against all costs, claims, and liabilities arising out of the lessor's possession and operation of said railroad, or under and by virtue of its lease or other contract for operating the same.

III. The lessee shall assume all traffic balances due from the lessor to other railroads or transportation companies; shall assume all contracts of the lessor for equipment, supplies, and material, and all other contracts and liabilities of the lessor to and with individuals or corporations, expressed or implied (its contracts with the holders of its indebtedness as scheduled excepted); and shall assume and defend all suits against the lessor arising out of or in any way connected with the past or future use and operation of the demised premises and roads, or roads hereafter received or operated by the lessee or the lessor, as herein provided, and pay all judgments obtained thereon.

IV. The lessee shall pay the interest upon any portion of the indebtedness of the lessor, or of its leased or operated lines, that shall be renewed or extended during the term of this lease, in like manner as upon the same indebtedness before renewal or extension; and, in case the lessee shall take up or purchase, and enforce by foreclosure or otherwise, any indebtedness of any of the

said leased or operated lines which shall not be so renewed or extended, the securities so taken up or purchased, and all title, benefit, or advantage of the enforcement thereof, shall enure to the lessor at the termination of this lease upon its reimbursing to the lessee all sums paid and expenses incurred in so taking up, purchasing, and enforcing the same.

If the lessor shall be duly authorized to construct, complete, and equip the main line of the Central Massachusetts Railroad Company, and to construct a branch or extension thereof between Palmer and Holyoke, as provided in the lease of said Central Massachusetts Railroad Company to the lessor, and to issue its bonds to meet the cost of such completion, equipment, and construction, the lessor shall, under the direction of the lessee, construct, complete, and equip said main line, and construct, complete, and equip said branch, as provided by said lease, and issue its bonds to meet the cost thereof. Said road and branch, as fast as it is completed and equipped, shall pass to the lessee by this indenture, if the Central Massachusetts Railroad Company shall consent to the assignment of its lease, or, in default of such consent, and until the same be given, the same shall be operated by the lessor upon the same terms and conditions as above provided in article II of this indenture, as to the other railroads whereof the lessor is unable to deliver immediate possession ; and the lessee shall be subject to the same duties and liabilities in relation thereto as in relation to other roads leased to the lessor, and shall pay the interest upon said bonds, and perform, or cause to be performed, the agreements contained in said lease to be performed by this lessor. If the lessor shall be duly authorized to buy the property and franchises of the Mystic River corporation, the Ocean Terminal Railroad Company, and the Ocean Terminal Railroad Dock and Elevator Company, the lessor shall issue its bonds or stock to an amount sufficient to pay for such properties and franchises, and for such improvements on the real estate of said companies and the property of the lessor on Mystic river as the lessee may deem necessary and proper to fit the same for the efficient and convenient transaction of business. The lessor shall issue its stock or bonds without delay for the funding of its existing floating indebtedness, to wit, all its indebtedness represented by notes payable, including notes given the Nashua & Lowell Railroad corporation if the same can be so funded, but not its current debts or open accounts. If, with the assent of the directors of the lessor, or after a decision of the railroad commissioners that the same are necessary and proper, as provided in Article VII hereof, the lessee shall make permanent additions to or improvements upon the demised premises, the lessor shall also issue stock or bonds to an amount sufficient to meet the cost thereof. In all the cases herein provided for in which stock or bonds is or are to be issued by the lessor, the lessor shall issue both or either class of securities, as

the lessee may request, but in each case only so far as it may legally do so : *provided, however*, that if the lessor shall require additional legislative authority to enable it to issue either class of securities, as desired by the lessee, the lessor shall, at the request and expense of the lessee, do all acts and things necessary to procure such authority.   Stock so issued, as herein provided, after the inception of this lease, shall, from the time of such issue, be deemed part of the lessor's capital stock, within the provisions of clause 3 of Article I of this lease.   Bonds so issued, as herein provided, after the inception of this lease, shall be scheduled and the interest thereon paid as part of the lessor's indebtedness, under and pursuant to clause 2 of Article I hereof.   The indebtedness of said lessor, as scheduled, shall be renewed by the lessor with the aid of the lessee as the same matures ; and the whole, or any part thereof, shall, at the request and under the direction of the lessee, be refunded at such time or times as may be practicable, at the lowest rate of interest practicable, any benefits from reduced rates of interest consequent upon such renewal or refunding of the indebtedness of the lessor or of any of its leased or operated lines to enure to the lessee.   The term of such renewal shall not extend beyond the term of this lease without the consent of the lessor.

V. Leases and contracts of the lessor for the operation of other railroads terminating during the term of this lease shall be renewed by the lessor, under the direction and with the assent of the lessee, upon the most favorable terms practicable.   But the said lessee shall not be bound to assent to the renewal of such lease or contract at a rental exceeding the rental payable at the inception of this lease, unless upon application by the lessor to the board of railroad commissioners said renewal shall be decided to be necessary to the reasonable protection of the interests of the lessor.   Leases and contracts so renewed shall be subject to all the provisions of this lease as effectually as if now existing and herein included, and, upon the expiration or earlier determination of this lease, shall be reassigned to, and enure to the benefit of, the lessor. The lessor shall also make and execute such other leases or operating contracts with other railroad companies as the lessee may request, every such lease or contract, however, if the lessor shall so elect, by its terms to expire at or before the expiration of the term of the lease created by these presents, and all obligations and liabilities arising therefrom to be assumed and sustained exclusively by the lessee, and the lessor shall be held harmless from any loss arising therefrom.   The lessee agrees that any lease or operating contract hereafter made with any railroad or railroad company or corporation mentioned in chapter 459 of the Acts of the Commonwealth of Massachusetts for the year 1869, with the exception of the Manchester & Lawrence, or with the Addison, Burlington & Lamoille, Consolidated Vermont, Central Vermont,

St. Johnsbury & Lake Champlain, Lamoille Valley Extension, Manchester & Keene, Missisquoi, Nashua, Acton & Boston, Cheshire, Montpelier & Wells River, Montpelier & White River, South-Eastern, Mt. Washington, New London Northern, Newport & Richford, Peterborough & Hillsborough, Peterborough, Profile & Franconia Notch, Brattleborough & Whitehall, Southern Vermont, Vermont Valley, Whitefield & Jefferson, Massawippi Valley, Woodstock, or Central Massachusetts Railroad, or any of them, or with any branch or extension of any such railroads, shall be made or executed with the lessor and not with the lessee or any person or corporation acting in its behalf, such lease or contract, at the expiration or earlier determination of this lease, to enure to the benefit of the lessor.

VI. The lessee shall have the right of voting on all stock owned by the lessor in other railroads or corporations, except as hereinafter provided, and said stock shall not be sold or otherwise disposed of by the lessee, nor by the lessor except with the assent of the lessee.

The shares of stock of the lessor in the St. Johnsbury & Lake Champlain Railroad Company shall be voted by the lessee so as to promote the interests of that corporation and of the lessor's system of roads, and so as to keep the road of that company in as good condition and repair as the same are now in, and, on all questions of increase of capital, of transferring the possession or operation of its road by lease or operating contract, or of the sale of its road to any other company, or of consolidation with any other company, shall be voted by the lessee only with the assent of the lessor manifested by vote of its directors. That the interest charges of the St. Johnsbury & Lake Champlain Railroad Company may be reduced to the lowest practicable point, the lessee's voting power may be used at its discretion to extend, renew, or refund said indebtedness or any part thereof; to foreclose any existing mortgage of the company's property; to make any new mortgage thereof; to reorganize said company; and to do all other acts and things necessary and proper for the reduction of its fixed charges, and consistent with the preservation, unimpaired, of the lessor's interest in said company as herein demised : *provided, however*, that the lessee hereby guarantees to the lessor the preservation, unimpaired, of its interest in and control of said St. Johnsbury & Lake Champlain Railroad Company as herein demised, and, at the expiration or earlier termination of this lease, will return to the lessor either the stock, debt, and bonds hereby demised, or other stock, debt, and bonds giving the same interest in, and conferring the same control of, the St. Johnsbury & Lake Champlain Railroad Company as the securities herein demised.

VII. The lessee shall have the right to make such changes in passenger stations, tracks, and terminal grounds in Boston and elsewhere, and to establish such union stations, and to make such

separations of railroad grade-crossings as the safety and accommo-
dation of the public and the convenient and economical trans-
action of business may, in its judgment, require : *provided, how-
ever*, that at the expiration or earlier termination of this lease the
lessor's stations, tracks, and terminal grounds shall be returned to
it in as good order and repair as the same are now in, and so that
the same shall be equally well fitted for the independent use and
operation of its own road or its leased roads by the lessor.

The lessee shall have the right to make permanent additions to
and improvements upon the demised premises, which shall include
any increase in track mileage, buildings, structures, and bridges
additional to those existing at the inception of this lease, and
buildings, structures, and bridges replacing those existing at the
inception of this lease, so far as the cost of such new buildings,
structures, and bridges exceeds the cost of restoring such old
buildings, structures, and bridges to as good a condition as when
new.    Such permanent additions and improvements shall, if
assented to by the lessor or decided by the railroad commissioners
to be necessary and proper, be paid for by the lessor so far as it
has or can procure the power to do so in the manner provided in
Article IV of this lease ; otherwise shall be paid for by the lessor
at the expiration or earlier termination of this lease, in the man-
ner hereinafter provided.

VIII.  The said lessee shall, at its own expense, maintain and keep
the demised premises, and all the property and fixtures of every
description which it shall receive or operate under this lease, in as
good order and condition as the same now are or shall be when
received by the lessee, so that there shall be no depreciation in
the same or any part thereof ; and, at the expiration or earlier
termination of this lease, shall return the same to the lessor in the
same good order and condition, and shall put the lessor in posses-
sion of all its leased roads and property at said time operated by
said lessee or said lessor under this indenture.   The lessee shall
use and operate the railroads and properties herein demised, in
accordance with the charter of the lessor and of the several corpo-
rations whose roads are so operated, and the laws of the common-
wealth of Massachusetts and of the states of New Hampshire and
Vermont and of the United States, so far as the same are respec-
tively applicable ; shall furnish all cars, engines, rolling-stock, and
equipment of every description required, in addition to the like
property hereby demised, for the due operation of the railroads
operated under and by virtue of this lease ; shall observe and per-
form all the provisions of contracts of the lessor with railroads
now leased or operated by it, or which may be leased or operated
by it, under the provisions of this indenture ; shall keep the
demised premises reasonably insured, and shall apply the proceeds
of any insurance to restoring and replacing the property destroyed,
or to making permanent improvements, not in the nature of ordi-

nary repairs, upon the demised premises; shall apply the proceeds of the rolling-stock, equipment, and other personal property herein demised, which it may deem advisable to sell, and which it is hereby authorized to sell at its discretion, so as to substitute therefor like property of equal value; shall replace buildings or structures on the demised premises taken down or removed, and which the lessee is hereby authorized to take down or remove at its discretion, with other buildings, structures, or permanent improvements upon the demised premises, of equal value, and equally convenient for the use of the lessor should this lease be terminated; shall furnish the directors and treasurer of the lessor with free annual passes over all the railroads operated by or for the lessee; shall permit the demised premises to be inspected annually by the lessor's directors and by some competent person appointed by the lessor, who shall report to the lessor the condition of said premises, and shall, for the purpose of such inspection, be furnished with free transportation over the railroads operated by the lessee under this lease, and shall receive a reasonable compensation for his services, to be paid as part of the lessor's operating expenses; shall make all returns required by law, and shall furnish the lessor with such abstracts of accounts as shall enable it to make all returns required of the lessor; shall not assign this lease nor underlet the premises, or any part thereof, except such portions thereof as in the judgment of the lessee may not be required for railroad uses, without the written assent of the lessor first had and obtained; and shall cause all rolling-stock hereby demised, and all rolling-stock substituted for that herein demised and added thereto, to be distinguished by appropriate names, numbers, or letters; and at the end of the term of this lease, or at any earlier termination thereof from any cause whatever, shall surrender the real and personal estate now or hereafter demised, as aforesaid, to be ascertained and determined according to the inventory hereinafter provided for, in the like good order and condition in which they are at the inception of this lease or when received by the lessee, or may be put during the term, with all improvements thereon or additions thereto, the amount of money, materials, and supplies to be surrendered or accounted for to the lessor to be equivalent in value to the amount on hand at the inception of this lease, as shown by said inventory, and all stocks, bonds, and securities, or any bonds or securities substituted therefor under the provisions of this indenture, to be returned at the expiration or other earlier termination of this lease: *provided*, that at the expiration or earlier termination of this lease the lessor shall pay to the lessee the value of any permanent improvements and additions not already paid for by the lessor, the said value to be determined, unless agreed upon by the parties, by the board of arbitrators provided for in the twelfth article of this lease.

IX. That the property herein demised and to be accounted for

at the expiration or earlier termination of this lease may be accurately determined, there shall be made, as of the day when this lease takes effect, a full, complete, and particular inventory, description, and appraisal of all estate and property, real and personal, belonging to the lessor and coming into the possession of the lessee by virtue of this lease; and to this, from time to time, shall be added such other estate and property as shall come into the possession of the lessee under the terms of this lease. Such inventory, description, and appraisal, and the additions thereto from time to time, shall be made by two competent persons—one selected by each party; in case of their disagreement, they shall refer the matter in difference to some third person, whose decision shall be final. Such inventory, description, and appraisal shall be made in duplicate, and an original furnished to each party; and shall be evidence of the nature, value, and condition of the property demised at the inception of this lease, or at the time of the additions thereto in all cases in which any question of such nature, condition, or value may arise.

X. The lessor shall maintain its existence and organization as a corporation, and to that end shall comply with all the requisites and forms of law; shall do all acts and things, and execute all legal instruments necessary and proper to put and secure the lessee in the full enjoyment of all the property, rights, franchises, and interests herein demised, and to carry into effect the true intent and meaning of this lease; and shall not increase its capital stock, as now existing and issued, without the assent of the lessee, except as provided in this lease. To further secure the lessee in the beneficial enjoyment of the property, franchises, rights, and privileges herein demised and specified, the lessor constitutes the lessee its attorney irrevocable, with full right and power, at the lessee's expense, to use the name of the lessor in all legal proceedings, and in all cases needful for obtaining, holding, and enjoying the premises herein demised and specified, and for all purposes consistent with the true scope and intent of this instrument.

XI. This lease is upon the condition that if the lessee shall at any time fail to make the lessor, as part of the rent herein reserved, the payments herein stipulated to be made to it to enable it to pay the interest on its indebtedness, or shall fail for thirty days to make any semi-annual payment, as stipulated for in clause 3 of Article I hereof, then and in such case the lessor may at once enter upon the demised premises, and upon any part thereof, as for the whole, and expel the lessee, and determine the estate hereby granted, and shall thereupon become seized and possessed of the demised premises, and of all premises then in possession of the lessee or the lessor under this indenture, and of every part thereof in its original right, and as if this lease had never been made; and upon the further condition, that if the lessee shall fail to perform any other of the covenants and agreements in this lease contained,

and such failure shall continue for six months after written notice of such failure from the directors of the lessor, the lessor shall have the like right to enter and expel the lessee, and revest in itself its former estate in the demised premises, and all premises then in possession of the lessee or the lessor under this indenture, and every part thereof: *provided, however*, that such entry by the lessor for breach of condition shall in no wise prejudice or impair any remedies to which it might otherwise be entitled for arrears of rent or preceding breach of covenants, or any other rights secured by this lease in case of its termination before the expiration of the time thereof.

XII. In case of any disagreement between the parties hereto as to the true intent and meaning of this lease, or any part thereof, or as to anything done under and by virtue of it, or growing out of it, the matter in controversy shall be referred by written submission to the arbitration of referees to be chosen in the manner following: One shall be chosen by each of the parties hereto; or if either shall unreasonably fail or neglect to appoint a referee when requested by the other, the board of railroad commissioners may, after due notice to the party so failing or neglecting, appoint a referee. The third shall be selected by the two so chosen. The arbitrators shall hear the parties, after due notice to each of them, and if either party fails to attend after such notice, may proceed *ex parte*. The award in writing of said arbitrators, or a majority of them, being duly notified to the parties, shall be final and conclusive upon them.

In testimony whereof, the said parties, by their respective presidents and treasurers, thereunto duly authorized, have caused their corporate seals to be hereto affixed, and these presents to be executed the day and year first above written.

November 18, 1887, Mr. E. H. Rollins, president of the Boston, Concord & Montreal Railroad, entered upon the track of said railroad at Concord, N. H., and made the following proclamation:

"By authority, and in behalf of the Boston, Concord & Montreal Railroad, I enter upon and take possession of the railroad of said corporation, extending from Concord, New Hampshire, to Groveton Junction, and the branch railroad from Wing Road, so called, to the base of Mt. Washington, together with all the lands, stations, and buildings used or occupied by said corporation for railroad purposes upon or along said route, and all the right, title, and easement of said corporation in and to the lands lying within and without the lines of the location of said railroad, and all depots, shops, buildings, tracks, and all other property, rights, easements, or franchises attempted to be leased by said corporation to the Boston & Lowell Railroad corporation by the pretended lease dated June 19, 1884.

" This entry is made because of the breach of the covenant in

said pretended lease whereby the Boston & Lowell Railroad corporation covenanted that it would not assign or underlet the premises demised by said lease, or part with the possession therein, without the written consent of the Boston, Concord & Montreal Railroad.

"It is made in pursuance of the covenants of said pretended lease, and for the purpose of determining the estate, if any, granted thereby." ·

W. A. Stowell, superintendent of the Boston & Lowell Railroad, White Mountains Division, who was present, said,—

"As superintendent of the Boston & Lowell Railroad, White Mountains Division, I decline to surrender the road or any of its property, and hereby order you off the premises, and shall use such force as may be necessary to expel you unless you depart in peace."

The Boston & Lowell Railroad executed by its then attorney the following agreement, and delivered the same to said E. H. Rollins:

"The Boston & Lowell Railroad, denying that the Boston, Concord & Montreal Railroad has any right of entry upon the premises leased by the Boston, Concord & Montreal Railroad to the Boston & Lowell Railroad, or that any condition of said lease has been broken, agrees that said Boston, Concord & Montreal Railroad has made an entry this day upon said leased premises, and for breach of condition, which is sufficient in point of form.

Concord, N. H., Nov. 18, 1887.
                    Boston & Lowell Railroad,
                         By its attorney, Charles H. Burns."

The Boston & Maine Railroad, by its attorney, Charles H. Burns, gave said Rollins then and there the following agreement:

"The Boston & Maine Railroad, denying that it has any possession of the leased premises referred to in the foregoing agreement, assents to said agreement, and will be bound by the same in any suit against the Boston & Maine Railroad.

Concord, N. H., Nov. 18, 1887.
              The Boston & Maine Railroad,
                         By its attorney, Charles H. Burns."

*R. Olney* (of Massachusetts), for the defendants. Any discussion of the question whether any provision of the plaintiff's lease to the Boston & Lowell has been violated assumes as matter of course the original validity of that lease. That being assumed, the Boston & Lowell, when it made its contract with the Boston & Maine in June, 1887, was in this position. It owned and possessed its own peculiar franchises, together with all the real and personal property inci-

dent and appurtenant to them. It also held and possessed certain franchises and property originally conferred upon and belonging to the plaintiff corporation. It had not succeeded to all the plaintiff's franchises. The plaintiff, notwithstanding its lease, still continued in existence as a corporation, and had, among others, the right and power to receive its rental, and to dispose of the same accordingly as the claims of creditors or the interests of stockholders might require. In short, the plaintiff, after its lease to the Lowell of 1884, retained all the rights and powers incident and appurtenant to its reversionary interest in the demised premises. On the other hand, after that contract, the Lowell, the lessee, was invested with every right and power essential to the due operation and maintenance of the plaintiff's road. For the term of the lease and subject to its conditions, the Lowell held all of the plaintiff's franchises essential to the operation of the plaintiff's road exactly as it held its own,—to be used, enjoyed, and exercised exactly as if *it* instead of the plaintiff had been the original grantee of them.

Another thing to be noticed in this connection is the peculiar character of the property originally belonging to the plaintiff, and by its contract of 1884 with the Lowell vested in the latter corporation, and by the latter corporation and the Maine still further dealt with in their contract of June, 1887. The essential subject matter of these several contracts was not land nor interests in lands. It was not tangible personal property of any description. When the state creates a corporation for the accomplishment of certain public objects, when it endows that corporation with the faculty of holding property conditionally upon its application of that property to those public objects, the franchise granted by the state on the one hand, accepted by the corporation on the other, represents and comprises in itself everything of value that the corporation has. It may acquire real estate; it may acquire personal property of any sort. But property is valuable only as it can be used, and only as the holder is competent to use it for the purposes to which it is adapted. The franchise of a railroad corporation, therefore, constitutes its estate—is the principal thing to which all the lands and chattels necessary for its exercise are simply inseparable incidents. They are inseparable incidents: the real and personal property necessary to the exercise of a railroad franchise is inseparable from it because the corporation is bound to exercise the franchise, is bound to acquire the property requisite for its exercise, is bound to serve the franchise with that property, and is bound, therefore, not to alienate it. The law welds the franchise and the property essential to its use indissolubly together, the corporation holding the franchise for the execution of a public trust, and holding the property as the indispensable means of such execution.

The subject-matter of the contract of 1884 between the plaintiff

and the Lowell, therefore—the demised premises—was the plaintiff's railroad franchise, which drew after it all the property essential to its use and enjoyment. So, the inquiry now being whether the Boston & Lowell has aliened or in any way dispossessed itself of the demised premises, what is wanted is to ascertain what corporation has and is exercising the plaintiff's railroad franchise. If, as matter of law, that franchise remains to-day in the possession of the Boston & Lowell, then there has been no breach of the covenant in the plaintiff's lease against any alienation of the demised premises. It has been broken only if the Lowell has in some way divested itself of that franchise.

What is necessary in order that a quasi public corporation like a railroad may divest itself of its essential franchises,—of the rights and powers given to it to be exercised in the promotion of certain public objects,—and what is the nature of the process by which those rights and powers may become vested in a person or corporation other than the original grantee? That a semi-public corporation, like a railroad, may part with its essential franchises, the one indispensable thing is the permission of the state. The state, and only the state conferring the franchises, is competent to authorize their surrender. Without such authorization they are wholly incommunicable. It follows, that when a railroad corporation, for instance, purports to sell or lease its essential franchises, it does not in strictness transmit or grant anything in any event. If it proceeds without the consent of the state, its act is wholly futile and ineffectual. If it proceeds with the consent of the state, it is the consent of the state, and that alone, which gives the act force and virtue. In other words, the consent of the state is the true source of the purchaser's or lessee's title. Hence, in every such case the selling or lessor corporation, instead of itself transmitting or conveying anything, merely exercises a power of appointment by which the purchasing or lessee corporation gets the franchises directly from the state, and as if a new grant of them were at that moment made.

The exact question, then, before the court on this part of the record and as respects this claim of the plaintiff is, Has the Lowell exercised an authorized power of appointment of the plaintiff's railroad franchise, and thereby substituted the appointee for itself in the use and enjoyment of that franchise? The appointee, if any, is of course the Boston & Maine Railroad. The plaintiff claims, in substance, that such appointment of the Boston & Maine has been made by force of the Lowell and Maine contract of June, 1887. I submit that on no admissible construction of that contract can that claim be maintained. In the first place, it is directly in the teeth of the language of the contract. As I have just observed, the grantee of a railroad franchise, by the act by which another person or corporation becomes invested with it, does not itself transmit or grant anything, but simply exercises a power of

appointment. By the invariable usage in such cases, however, the formal instrument of appointment treats the power as property, and, the intent being incontestable, it operates on familiar principles as a good execution of the power. For instance, this Lowell and Maine contract of June, 1887, though nothing but the exercise of a power of appointment so far as the Lowell's own franchises are concerned, purports to demise and let them just as in the common case of an ordinary lease of real or personal estate. How is it under that contract with the plaintiff's franchises—which the Lowell held in addition to its own? They are not appointed nor demised nor let by any language in the contract that is susceptible of that interpretation. On the contrary, the plaintiff's franchises, with those of all other roads which the Lowell could not part with without breach of contract, are expressly excepted from the things the Lowell does purport to convey. Still further, after being taken out of the category of things conveyed, the plaintiff's franchises, with those of all other roads similarly situated, are then separately dealt with in a special clause of the contract, by which it is explicitly declared that the Lowell shall retain them, and shall not divest itself of them until some future time when it can legitimately do so. Thus, the express language of the contract is absolutely opposed to the claim of the plaintiff that thereby the Lowell made any appointment or conveyance of the plaintiff's railroad franchise.

In the second place, the manifest intent of the parties antagonizes the plaintiff's claim in an equal degree. They realized in June, 1887, as fully and clearly as we do to-day, the precise situation. They knew that the Lowell held various railroad franchises which it could not part with without the consent of their original owners. They knew that that consent had not even been asked for, much less given. They knew that any assignment, or subletting, or alienation of any sort, of those franchises would cause serious trouble and mischief for all parties concerned. With that knowledge, the exact thing the parties to the contract meant to avoid, and must have meant to avoid, was any assignment, or alienation of any sort, of railroad franchises which the Lowell derived from other corporations and could not part with without their consent. The parties not only say so in the contract in express terms, but their interests and all the surrounding circumstances show that they could not have had any different purpose. As respects, then, this claim that the Lowell and Maine contract of June, 1887, amounts to an assignment or alienation of the plaintiff's railroad franchise, two things are established,—first, that the express language of the contract is diametrically opposed to any such claim, and second, that the manifest intent of the parties is equally opposed to it. The plaintiff's contention can prevail, therefore, only in one contingency,—only if the parties have builded, perhaps not better, perhaps not worse, than they knew, but cer-

tainly differently, and have done as matter of law what as matter of fact they meant to leave undone.

The proposition of the plaintiff is, that notwithstanding the express terms of the Lowell and Maine contract of June, 1887, in its application to the plaintiff's road, and notwithstanding the undeniable intent of the parties to it, that contract does amount to an assignment or alienation to the Maine of the plaintiff's railroad franchise. The plaintiff assumes that the contract is and can be nothing else than an assignment, or subletting, or transfer of possession of the plaintiff's railroad franchise,—than an alienation of it of some sort; and that the Lowell and the Maine cannot enter into such relations respecting the plaintiff's road as the contract calls for without an alienation of the plaintiff's railroad franchise within the prohibition of the covenants of the plaintiff's lease. I submit that that position is an entire mistake. The statute law of New Hampshire, section 17, chapter 100, Laws of 1883, enacts that " Two or more railroad corporations may contract that either corporation shall perform all the transportation of persons and freight upon and over the road of the other." Thus, the statutes of New Hampshire expressly authorize one railroad corporation to do all another's transportation work as the latter's servant and agent, and without dispossessing the latter of its essential franchises and property. And this Lowell and Maine contract of June, 1887, in its application to the plaintiff's railroad, sets on foot, I submit, an arrangement of precisely that sort, and neither in legal effect nor practical execution constitutes any alienation of the demised premises within the prohibition of the plaintiff's lease.

Let us consider the several ways in which the statutes of New Hampshire authorize a New Hampshire railroad corporation to deal with its railroad franchise, to which, as I have already argued, is inseparably attached all its essential railroad property. In the first place, it may dispose of its franchise and discharge itself of all duty thereunder forever by a union or consolidation with another railroad company. In the second place, it may dispose of its franchise and discharge itself of any duty thereunder for a term of years by a lease, the lessee becoming the owner of the franchise *pro hac vice.* In the third place, it may retain and itself exercise the franchise through the instrumentality of natural persons. In the fourth place, it may retain and itself exercise the franchise through the instrumentality of another railroad corporation contracted with for that purpose. A distinct statute of New Hampshire also provides that one railroad may contract with another for the use of the latter's road. But that statute, I take it, is immaterial in this connection, because, as I understand the construction put upon it by this court, the effect simply is to permit the joint use by two railroad corporations, each with its own motive power and cars, of a railroad belonging to one of them. This construction would seem to be a necessary one, because a contract by one

railroad corporation with another for the exclusive use of another's road could not be anything but a lease.  These being the several ways in which a New Hampshire railroad corporation may deal with its essential railroad franchises and the railroad property inseparably appurtenant to them, to which of them did the parties resort in this Lowell and Maine contract of June, 1887, as it relates to the plaintiff's road?  There was not, of course, any attempt at consolidation of roads.  There was not any attempt to provide for the joint use of one railroad by the respective engines and cars of two companies.  But the contract made a change of some sort.  Before the contract, the Lowell had worked the plaintiff's road in the ordinary manner, and the Maine had no relations to the road or its working of any sort.  After the contract, the Maine just as certainly had such relations of some sort. What was their nature?  They might have been those of assignee or alienee under the plaintiff's lease of the plaintiff's railroad franchises and the property incident thereto, which is what the plaintiff claims they were and are.  On the other hand, they might be simply those of a contractor to perform all the transportation of persons and property upon and over the plaintiff's road.  And, as the most reasonable and the true construction of the Lowell and Maine contract of June, 1887, in its application to the plaintiff's road, I submit, that under it the Lowell passed no estate whatever in the plaintiff's road or franchise, either permanently or temporarily, but simply constituted an agency whereby the Maine undertook the working of the plaintiff's road, or, to use the language of the statute more nearly, contracted for all the transportation of persons and freight upon and over the plaintiff's road.  The difference between the two theories is for present purposes vital.  On the plaintiff's theory of the nature and operation of the contract of June, 1887, as regards the plaintiff's road, there was of course an alienation of the demised premises, a change of possession of the plaintiff's railroad franchise whereby it became vested in the Maine either as assignee, alienee, or tenant of some sort.  On the other hand, on the defendants' theory of the nature and operation of that contract as applied to the plaintiff's road, the demised premises, to wit, the plaintiff's railroad franchise with its appurtenant property, did not change hands at all.  It remained in the undisturbed possession of the Lowell,—the only relation assumed to the plaintiff's road by the Boston & Maine being that of contractor to work the plaintiff's road in the name of the Lowell and under its franchise, and as its servant and agent.  If that be the true construction of the Lowell and Maine contract of June, 1887,— and I shall presently consider whether it be or not,—then the practical execution of the contract by the parties, that is, the working of the plaintiff's road by the Maine, is not an alienation of the demised premises within the prohibition of the plaintiff's lease.

A corporation must act through agents.  But that necessity of

its being does not operate to deprive it of the legal possession of its franchises and property. A corporation ordinarily carries on its business through the instrumentality of natural persons. But if it can find artificial persons or corporations legally and practically qualified for the work, there is no reason why it should not employ them, nor, if it does, why such employment should operate to divest it of its corporate estate. A railroad company is usually chartered to build as well as to run a railroad, and very commonly exercises its franchise to build by putting out its whole road under contract to one man. The practice is of unquestionable validity, and never has been considered and cannot be considered as any abandonment or alienation by a railroad company of one of its most important franchises. It would no more be such abandonment or alienation, of course, if the railroad company's contract for the building of its road, instead of being with one individual, were with a corporation—a construction company, for instance. But if a railroad company may exercise its building franchise through a single contract with one individual without any abandonment or alienation of the franchise, on the same ground it may execute its operating franchise in the same manner and also without any abandonment or alienation of the franchise. Without pausing upon that point, however—railroad operating companies are just as conceivable as railroad construction companies, and if by general or special laws the state of New Hampshire were to charter companies for the sole purpose of working railroads for their owners, it would not be disputed that any railroad corporation might avail itself of such an instrumentality, and carry on its business through it without thereby evicting itself from its railroad franchise and property. It may be well also to observe in this connection that it is entirely immaterial, so far as the point now under consideration is concerned, that a railroad company's contracts with its employés are usually for short periods of time. If that were not so,—if all its contracts with every one of them, from general manager to crossing-tender, were on twenty or thirty years' time,—the railroad company's possessory right and title in its plant and franchise would be wholly unaffected, and would be the same as they ordinarily are. It being plain, then, as I think it is, that a railroad corporation, like every other, must act through agents; that it may employ as such agents either natural persons or corporations legally qualified to act as such; that it may do its business through one contract with a general agent or through many contracts with many special agents; that its contract or contracts with either class of agents may be of long or of short duration, at its discretion,— these things being plain, as I think they are, it is equally plain that in all such cases and in every such case the railroad company's legal possession of its road and franchise remains intact, the indisputable rule of law applying, that, whatever may be the rights of the principal and agent *inter sese,* as against all the world, the

agent's possession is always and for all purposes the principal's possession.

It has not been adjudicated in New Hampshire, I suppose, that it is competent for a railroad to put out all its operating work under contract to one man. Neither, I suppose, have the laws of New Hampshire, by special enactments or general laws, authorized the formation of companies for the sole purpose of working railroads for their owners. But very early in the history of the railroad legislation of the state it was enacted that two railroad companies might contract that one should do all the other's work. A statute to that effect was continuously in force from 1842 to 1867, when it was either purposely or inadvertently omitted from a revision or compilation of the public laws at that time made. The provision, however, reappears in 1883 in the Colby act, so called. It forms the first part of section 17 of that act. It immediately precedes the grant of the railroad leasing power, and is obviously regarded as conferring a power of a wholly different character. Indeed, it has always been so treated in the legislation of New Hampshire,—the power of two railroad corporations to contract that one may do the other's entire transportation service being powers separately granted by distinct enactments, and existing side by side as distinct powers, during the whole or nearly the whole of the period from 1842 to 1867. In the act of 1883 the difference between the two powers is even more emphatically marked, since a contract of lease requires the approval of stockholders, while a contract by one road to work another may be made by directors only. What the legal difference is between the two powers so distinct in legislative contemplation is manifest, and cannot be mistaken. A lease, *ex vi termini*, implies possession,—a change of possession from the general owner to a tenant. As applied to a transaction between railroads, it means that the lessor's essential railroad franchise becomes vested in the lessee, to be used and exercised by it exactly as if it were the original grantee of the franchise. Because a lease between railroads is of this character, because it involves a transfer of the lessor's essential railroad franchise, the approval of stockholders is necessary. Indeed, if I understand the doctrine of this court, a lease between railroads involves so vital a change in the purposes of the lessor's incorporation that nothing less than the assent of all the stockholders can give it validity. While this is the nature and effect of a contract of lease, a contract between railroads by which one is to work another is of a wholly different character. Such a working contract is not inconsistent with the purposes of the employing company's charter, and involves no breach of the original compact between stockholders. It simply selects one out of various legitimate means for accomplishing the objects of such charter and such compact. It does not operate as a transfer of the employing company's essential franchise, but simply secures an agent through

whom the franchise is to be executed. The virtue of the enabling statute does not consist in its authorizing one railroad company to do its work through an agent. It cannot do its work in any other way. What the statute does is to qualify another railroad corporation as such agent. A railroad corporation is, of course, competent to work its own road. But to enable it to work the road of another corporation as the latter's agent requires express statutory authorization. If, however, the authority is granted, any railroad company employed under it is an agent just like any other, and is nothing else. That is to say, it runs the road in the employer's right and under the employer's franchise, and its possession is the employer's possession.

The defendant's position, then, as respects the alienation claim of the plaintiff, is, that the true inquiry is what corporation has and is exercising the plaintiff's railroad franchise; that the Lowell could not exercise it except through an agent or agents of some sort, and might employ for that purpose any persons or corporations qualified by law to act as such agents; that the statutes of New Hampshire expressly qualify one railroad corporation to do another's entire transportation service as the agent of the latter; and that if by this Maine and Lowell contract of June, 1887, as applied to the plaintiff's road, nothing more is done than to make the Maine the Lowell's agent for the performance of the transportation service of the plaintiff's road, then the plaintiff's railroad franchise, with all the railroad property inseparably appurtenant thereto, has always remained and now remains in the possession of the Lowell, has not been parted with, and there has been no breach of the alienation covenant of the plaintiff's lease.

It remains to consider the true character and construction of this Lowell and Maine contract of June, 1887, in its application to the plaintiff's road. The plaintiff interprets it as constituting an assignment or alienation of the plaintiff's essential railroad franchise with the property inseparably annexed to it. That interpretation is one which I submit cannot possibly be maintained. The manifest intent of the parties is directly opposed to it. We know that it is so, and must be so, both because they say so in express terms in the contract itself, and because their mutual interests, as they obviously well knew, would be greatly prejudiced by any assignment or alienation of the plaintiff's franchise which did not have the plaintiff's previous consent in writing. But the argument from the parties' intent does not stop at showing what they did not want and what they meant to avoid. When their entire environment is considered, it is plain, I submit, what they did want and what they meant to accomplish. The statute enabling one railroad corporation to hire another to do its work was obviously founded largely on economical considerations. It was thought that a large corporation, with plant and capital to correspond—a wholesale dealer in transportation—could do the work

of a small corporation with small capital and equipment—a retail dealer, that is—at a great saving of expense, to the mutual benefit of the parties and to the advantage of the public. Now, at the time this Lowell and Maine contract of June, 1887, was made, and by force of that contract, the Lowell was giving up the greater part of its railroad business, but could not give up the plaintiff's road on account of this covenant against alienation in the plaintiff's lease. Being obliged to run the road temporarily, and an express statute authorizing it to get the work done by another railroad corporation as agent, it would naturally avail itself of the statute, and resort to such agency because thereby it could run the road to the best advantage, most inexpensively in its own interest, and most efficiently as regards the public interest.

We come to the examination of the terms of the Lowell and Maine contract of June, 1887, with very definite knowledge of the parties' intentions. We know what they did not want and why, and we know what they did want and why. The provisions of the contract conform to and carry out the parties' intentions as thus ascertained and explained. It is declared, in the first place, that the plaintiff's road shall be operated in all respects under the direction of the Boston & Maine. That makes the Maine the agent to work the road—the operating power and instrumentality beyond all peradventure. I need not dwell upon that point; there is no excuse for my dwelling upon it, because, incredible as it may seem, it is a matter upon which my friends on the other side and myself are substantially agreed; and when a unique proposition of that sort is by some miracle discovered, I take it that the court will be only too glad to regard it as finally settled, and to hear nothing more about it. In the next place, the contract compensates the agent for its services in working the road by giving it any profit of the business,—the provision being that the agent shall have all the gross receipts of the road upon condition of its discharging all its principal's liabilities on account of it. It will be said that the proposition that the contract makes the Maine the agent of the Lowell to work the road is inconsistent with the language,—that the Lowell shall remain in possession and itself operate the road. But, in the third place, that language is to be taken in connection with the other language,—that the plaintiff's road shall be operated under the direction of the Maine in all respects; and so construed, it is conclusive upon the point that the Lowell did not undertake to assign or in any way alienate the plaintiff's essential railroad franchise, but simply constituted the Maine, being expressly qualified therefor by statute, its agent to work the road under contract. In that view, of course, the Lowell does continue in the operation of the road, and does continue to be responsible for the operation of the road both to the state and to all customers of the road, and is the only party known to either in connection with such operation. The business of the road is,

as it ought to be, carried on in its name, in its right, and under
its franchises.   And the only change which the contract makes in
the conduct of the business is to put one lawful agent in the place
of another, is to substitute for the instrumentality of natural
persons that of another railroad corporation.

It will be said that on the theory I am urging there is no sub-
stantial difference in practical results between a working contract
between two railroad companies and a contract of lease, and that
the Maine is to-day in substantially the same position as if it were
assignee, sublessee, or alienee of some sort under the plaintiff's
lease.   But that is not so at all.   In the first place, if a lease is
authorized, the lessee does not become in any way or sense the
lessor's agent.   It enters into direct relations with the state and
with all parties using the road.   The lessor's essential railroad
franchise becomes vested in it, to be used and enjoyed as if it were
the original grantee of the franchise.   The same thing is true of
an assignee or sublessee under a valid lease, if the assignment or
subletting be authorized.   On the contrary, the status is exactly
the reverse, if all that the railroad corporation does is to hire
another corporation to do its work.   In that case no franchise is
divested or vested anew, but the employing company's railroad
franchise remains in its possession, and it alone is responsible for
its exercise.   For example: Under this Lowell and Maine contract
of June, 1887, construed as I think it must be, the Lowell and not
the Maine is responsible alike to the state and to private parties
interested both for the working of the plaintiff's road and for the
manner in which it is worked.   Again: It is not true that a rail-
road company working the road of another as agent has all the
same rights, powers, and privileges as a lessee of the road, or as an
assignee or sublessee under a valid lease.   A genuine working con-
tract—a contract by one road to work another—does not give the
agent the power to extend the road, to build branches to it, to
hire or operate other roads, to acquire land or other property for
it, or to use the principal's power of eminent domain for any pur-
pose.   Under this Lowell and Maine contract of June, 1887, for
instance, does the Maine get any power to have the plaintiff's road
extended, to have branches built to it, to hire or operate other
roads in connection with it, to acquire property for it, or to put in
motion the plaintiff's power of eminent domain?   It is clear that
it does not.   All it gets is the right to run the road as agent, to
run the road as existing at the time of the contract; all the other
powers, privileges, and franchises coming to the Lowell under the
plaintiff's lease still remain in the Lowell, to be exercised, used,
and enjoyed by it alone.   On the other hand, in the case of a
valid lease, or authorized assignment or subletting under a valid
lease, the lessor's entire railroad franchise passes.   It is indivisi-
ble in its nature, and the lessee or assignee or sublessee is entitled
to every right and power essential to the enjoyment of the whole

franchise. In what name the franchise shall be exercised is some-
times made a question, as, for instance, whether needed railroad
property shall be taken in the name of the lessor of a railroad or
in the name of the lessee. The suggestion that the lessor's name
shall be used is founded upon its reversionary interest in the
demised premises; whereas, it is entirely clear that the only
taking for which an immediate public exigency can be vouched is
a taking by the lessee. But what name shall be used in such case
is a matter of form and not of substance, is a technical rather than
a real question. That the practical power, discretion, and author-
ity in the matter is in the lessee, it being the party holding the
franchise with the assent of the state and responsible for its exer-
cise, is not and can not be seriously controverted.

It may be objected to the Lowell and Maine contract of June,
1887, regarded as a working contract, that it does not refer in
terms to the agent's compensation for services, and does not in
terms declare what that compensation shall be. But the substance
of the contract, and its necessary operation and effect, are to be con-
sidered. The Lowell held the plaintiff's railroad plant and fran-
chise under a contract which required the business to be carried
on, and required certain expenditures to be made on the road and
in the interest of creditors and for the benefit of stockholders.
Under the contract the Maine undertakes the business for the
business,—for any profit there may be in it after all its principal's
expenditures on account of the road have been satisfied. That is
one mode, certainly, of compensating the Maine for services as
working agent,—whether wise or not wise in point of fact for either
or both parties is now immaterial. The only question here is,
whether it is a mode of ascertaining and paying the agent's com-
pensation which the statute authorizes. To that, I submit, there
can be but one answer. The working contract any two railroad
corporations may make is, as respects form and terms and the
mutual considerations enuring to the parties, wholly unlimited.
The statutory power is of the most comprehensive character. If
the discretion of the two contracting corporations be exercised in
good faith, it is absolute and final.

It may be suggested that this Lowell and Maine contract of
June, 1887, in its application to the plaintiff's road, has the char-
acter of a lease rather than of a working contract in respect to
the time it may last; that no limit of time is set; that it may go
on forever, or, at least, for the entire balance of the term of the
plaintiff's lease, to the Lowell. Well, if that be the true construc-
tion of the contract, it does not lead to the conclusion suggested,
and it does not tend to show that the contract is not a genuine
working contract. The statute puts no limit to the duration of
such a contract. It leaves the period it is to run to be determined
wholly by the two contracting corporations, and, if they choose to
make that term as long as the term for which railroad leases are

generally made, it is perfectly competent for them to do so. But I by no means agree that the construction of the contract suggested is the true one. On the other hand, I submit that the contract was not meant to be, and is not to be regarded as, of a lasting or permanent character. The Lowell undertook to lease and make present delivery of its railroad property, so far as it could do so without breach of contract. As to property of which it could not make present delivery, it undertook to make " reasonable efforts to deliver"—I cite the exact language of the contract— and actually to deliver as soon as practicable. Meanwhile, as respects the property it could not at once deliver, and which it was to make reasonable efforts to deliver, the Lowell and Maine made an arrangement to work it. But " reasonable efforts" means reasonable in point of time as well as in all other respects. Consequently, the Lowell and Maine arrangement for the working of the plaintiff's road was meant to endure only so long as might be necessary to enable such reasonable efforts to be made. It was an *ad interim*, a provisional arrangement, to continue in force pending reasonable efforts to deliver the road under an assignment of the lease. And, although the contract does not itself fix any definite time within which the reasonable efforts are to be made and concluded, the law supplements the contract in that respect and makes the time such reasonable time as under all the circumstances of the case may be adjudged just and proper.

It may be said, finally, that the Maine's working the plaintiff's road as agent is within the mischief of the alienation clause of the plaintiff's lease ; that the plaintiff suffers the same injury as if the Maine were in possession under an assignment or subletting under the plaintiff's lease. But it is to be remembered, in the first place, that these anti-alienation covenants of leases are not favored in law, but are to be construed with the utmost strictness. The covenant must be broken in its exact and literal significance, or it will not be held to be broken at all. But, in the second place, it is not true that the Maine's working of the plaintiff's road as agent for the Lowell is the same thing or means the same thing to the plaintiff as if the Maine were in possession as assignee or sublessee under the plaintiff's lease. It is not the same thing to the plaintiff, and it does not mean the same thing, for the reasons already stated, because the Maine, working the plaintiff's road as agent for the Lowell, merely runs the road as it is, whereas, if the Maine were in possession under a valid assignment or subletting under the plaintiff's lease, it would be subrogated to the lessor's essential railroad franchise, including the power to extend the plaintiff's road, to build branches to it, and to acquire property for it by purchase, or to condemn it by the power of eminent domain. But there is still another, and, I submit, a conclusive answer to the suggestion that the Maine's agency for the working of the plaintiff's road is within the mischief of the alienation clause of the

plaintiff's lease, and is something meant to be prohibited by it. On the contrary, such agency is something that the plaintiff must be held to have contemplated, and to have intended to permit and sanction, from the very outset. The statute by which one railroad company may hire another to do its work was in force at the time the plaintiff made its lease to the Lowell in 1884. The plaintiff knew at that time, therefore, that the Lowell might lawfully work its road by employing the Maine or any other railroad corporation to do all the transportation service of the plaintiff's road. Knowing that, if the plaintiff meant to limit the Lowell in the working of the plaintiff's road to any one kind of agent, if it meant to prohibit the employment of another railroad corporation for that purpose, it was bound to say so and to have its intention expressed in the instrument of lease in unequivocal terms. But there is nothing whatever in the contract on the subject. The inevitable result, therefore, is, that the plaintiff must be held to have authorized the Lowell to work the plaintiff's road by any agent legally competent to do it. And, as the law then made and now makes the Maine or any other railroad corporation a competent agent to work the plaintiff's road, it follows that, instead of the plaintiff's having any right to complain that the Maine is working its road as agent of the Lowell, in truth and in fact it consented to exactly that thing being done when it executed the contract of lease.

This contract of June, 1887, between the Lowell and the Maine, is one in form but two in substance; that is, it deals with two distinct subject-matters by two distinct sets of provisions. Undoubtedly the form might have been different: the separate contracts might have been embodied in separate instruments, one dealing with the railroad property of which the Lowell could dispossess itself without breach of contract, and the other dealing with the railroad property of which it could not so dispossess itself. If the two contracts had been put into two instruments, perhaps the vital difference between the two contracts would have been more marked and more apparent to persons not familiar with legal principles and the legal rules governing the interpretation of writings. But to lawyers and to a court, the Lowell and Maine contract of June, 1887, embodies two distinct contracts respecting two distinct subject-matters, with a certainty and clearness which would not be increased in the remotest degree if two indentures had been used instead of one, each applicable solely to one of the two distinct subject-matters. My business at the present moment is with the last named of these two contracts,—with that contract between the Lowell and the Maine which was meant to relate to such railroad property as the Lowell could not dispossess itself of without the assent of the original owner. Three views of that contract are possible in its application to the plaintiff's road. One is, that it contemplated and effected an assignment or alienation of the plain-

tiff's essential railroad franchise and the property incident thereto from the Lowell to the Maine. But the court cannot adopt that construction except upon some compulsion the grounds of which are not obvious, because it directly conflicts with the express terms of the contract, confounds the distinction between its two subject-matters which the contract everywhere makes, and totally defeats the unmistakable intent of the parties. The second view is, that under this contract the Lowell gives the Maine influence over the operation of the plaintiff's road, for which the Maine pays by guaranteeing the Lowell against any loss from such operation, the actual possession and operation remaining all the time in the Lowell. To that it is a possible objection that that precise kind of contract is novel, may not be within the general powers of the two contracting corporations, and is not specially authorized by any statute. If that should turn out to be so, still, while any influence proven to have been exercised by the Maine might be held to be illegitimate, the Lowell would, nevertheless, be left in the undisturbed possession of the plaintiff's road and franchise, and there would be no breach of the covenant against alienation of the demised premises.

The third view, which I have been urging, is not open to the objections to which the other views stated are liable. It does not conflict with the language of the contract, nor defeat the plain purpose of the parties, nor make their mutual stipulations *ultra vires*. On the other hand, it accords with the words the parties have used, carries out their manifest purposes, and makes the contract one for which special statutory authority can be vouched. In this view, too, the contract is found to be exactly such a one as the parties would naturally and probably make under the circumstances of the situation in which they were placed. On the one hand, the Lowell could not at once deliver the plaintiff's road, but had bound itself to make reasonable efforts to deliver and actually to deliver the road as soon as it could lawfully do so. On the other hand, the Lowell was going out of active railroad business generally, and, pending its reasonable efforts to deliver possession of the plaintiff's road, it could not work it in the ordinary way except at great disadvantage. But one alternative mode of working it in this interval was open, and that was by contracting with and employing some other railroad corporation to do the work. That railroad corporation need not have been the Boston & Maine. But, on the other hand, there was no objection to its being the Boston & Maine : it would naturally be the Boston & Maine, and as the Boston & Maine was under obligation to accept the road when the Lowell could deliver it under an assignment of the plaintiff's lease, the Maine might properly insist that the *ad interim* working of the road should not be in strange or unfriendly hands, nor in any other hands than its own.

We have, then, two principal purposes of this contract definitely

established,—first, that the Lowell should in no way alienate the plaintiff's property and franchise; and second, that pending the reasonable time in which the Lowell should make efforts to deliver the property under an assignment of the lease, the Maine should work the road, which working, as the Maine could legitimately do it only in one capacity, namely, as the agent of the Lowell, the parties are to be presumed to have intended should be done by it in that capacity and no other. To these two chief purposes of the contract its substantial provisions correspond and conform. They are exactly what they might have been expected to be under the circumstances. It is difficult to see how they could be different. For example: As to the mode of operation of the plaintiff's road, the parties had no discretion, the Lowell being bound to work it according to the terms of the plaintiff's lease, and being wholly incapable of authorizing the Maine to work it in any other way. So, as to the agent's compensation for services: Circumstances are conceivable in which a railroad corporation would not work a road merely for the profit it could get out of it, and in which, on the other hand, the owner of a railroad would not consent to let another railroad corporation work it merely upon being indemnified against loss. But under the actual circumstances of the then existing situation, it is perfectly plain that the Lowell could not reasonably be expected to let another railroad corporation work the plaintiff's road except under a contract which secured it against loss, because the mode of operation might be the very thing which would cause the loss. On the other hand, the Maine could not reasonably be expected to do any more than indemnify the Lowell against loss on account of the plaintiff's road, because the operation of that road was not necessarily profitable, and had not been uniformly profitable in the past. Hence, the contract contains exactly such a bargain as the parties might be expected to make in the circumstances in which they were placed—a bargain by which the Lowell on its part was content with immunity against loss on account of the plaintiff's road, and by which the Maine on its part was content to accept for services a compensation measured by the profit it might be able to make the business yield.

As for the language of the contract, I readily agree that it was not necessary formally to declare that the Lowell should remain in possession of the road and should operate it. Its hiring of the Maine to do the work of the plaintiff's road would not have dispossessed the Lowell of the plaintiff's railroad property and franchise, even if that language had not been used. But the terms employed, even if objectionable as surplusage, are not otherwise harmful. They do exclude most emphatically all idea of any attempted assignment or alienation of the plaintiff's railroad franchise by the Lowell to the Maine. They do not exclude, but, on the other hand, are entirely consistent with, the purpose of the Lowell to make the Maine its agent to work the plaintiff's road under con-

tract as specially authorized by statute.   On these grounds, and
because the contract as thus interpreted does not violate any law
or any other contract, but is seen to be exactly such a contract as
the parties, in their then situation, would naturally and probably
make, the defendants confidently ask the judgment of the court
upon this part of their defence.   It need not be denied that the
contract offers opportunities for verbal criticism ; that specious
and superficial reasoning, sticking ·in the bark, dealing with words
and phrases, and ignoring the purpose of the parties, may seem to
make the contract of difficult or of doubtful interpretation.   But it
is the province of the court to construe contracts according to the
spirit that makes alive, rather than according to the letter which
kills ; to give to their provisions such meaning and effect as, con-
sistently with the language employed and when viewed in the
light of all the surrounding circumstances, the parties meant they
should have.   The defendants ask for nothing more than that
this contract be so interpreted and so dealt with ; and if it is, they
cannot bring themselves to have any fear of the result.

It is argued that under the Lowell and Maine contract of June,
1887, as applied to the plaintiff's road, the Lowell is agent of the
Maine, and not the Maine of the Lowell.   As the Maine gets all
discretion, choice, and authority as to the working of the plaintiff's
road, and, moreover, takes all the receipts of the road and pays
all the Lowell's bills on account of it, the argument is, that instead
of being agent, it is really a substituted principal.   But the rela-
tion of principal and agent is determined not by the extent, but
by the source, of the powers exercised.   A delegated authority may
be coextensive with the principal's entire authority.   An attorney
under the most general power is none the less the agent of his
constituent, than an attorney under a special power.   A man, as
agent, may have all the power over another's property or business
that he could have if the property or business were his own.
What makes him agent, and not principal, is, that he acts in
another's right, and properly in another's name ; that he is liable
to account ; and that his power will, sooner or later, terminate.
The same tests which determine the existence of the relation of
principal and agent as between individuals, determine it as
between corporations.   The Maine is simply agent in the working of
the plaintiff's road, if the powers it exercises to that end belong
not to it, but to the Lowell; if it is bound to exercise them in the
Lowell's name and subject to the latter's right to call it to account ;
and if it must, sooner or later, cease such exercise.   Further, the
Maine is none the less an agent to work the plaintiff's road
because its compensation is dependent upon the results of the
business—because the Lowell is to turn over to it all the receipts
of the business on the one hand, and it is to discharge all the
Lowell's liabilities on account of the business on the other.   It is
exactly such a case as if A, the owner of a factory, were to hire B

to carry on the business, and, by way of compensating B for services, were to agree that B should have the whole or a part of the profits of the business, provided, on the other hand, he would guarantee A against losses. The principle is now settled by a great number of decisions, that under such a contract B, notwithstanding he bear the profit and loss, does not become a partner or principal in the business, but is simply an agent, whose compensation for services is regulated by the results of the business.

It is argued that on the defendants' interpretation the Lowell and Maine contract of June, 1887, in its application to the plaintiff's road, operates like a lease, or an assignment or subletting under a lease, and vests in the Maine the same possession of the plaintiff's road and franchise as if it were in possession as such lessee or assignee or sublessee. That, under the contract construed as the defendants say it should be, the Maine gets a sort of possession—a possession enabling it to work the plaintiff's road as the Lowell's servant and agent—is not denied. But that such possession is legally the Lowell's possession, and not distinct from nor independent of it —that it is something radically different, both in rights and responsibilities, from the possession acquired by a lessee or a lessee's assignee or sublessee—are things the defendants believe they have clearly shown in the brief and argument already filed, and which do not therefore demand any further notice. As respects this claim, however, and as respects another of the same character, namely, that the plaintiff shows a breach of the anti-alienation covenant of the plaintiff's lease whenever it shows any possession of the demised premises by the Maine of any sort or kind, it is respectfully submitted that the plaintiff's arguments in support of them only prove a radical misconception of the real issue. For example: It is intimated that whether the Lowell and Maine contract of June, 1887, as applied to the plaintiff's road, amounts to an assignment or alienation of the plaintiff's road and franchise, is immaterial, because, whether it does or does not, there has been a change of possession within the prohibition of the lease. But the truth is, that the facts relied upon by the plaintiff as constituting such change of possession do, or do not, bring it about according to the legal significance and character which the contract impresses upon those facts. The physical occupation of the plaintiff's road determines nothing. It is in possession of a body of employés whose possession is that of their principal, whoever that principal may be. The statutes of the state permit the Maine, or any other railroad corporation, to be interposed as general agent between the Lowell, the lessee of the plaintiff's road, and the employés in actual physical possession of it, and such agency does not disturb or prejudice the Lowell's legal possession. Hence, as the Maine may be using and working the road in either capacity, wrongfully as assignee or sublessee under the plaintiff's lease to the Lowell, rightfully as agent under contract—as there are no physical crite-

ria of the capacity in which it is acting—it is to be determined and can be determined only by the contract of the parties,—by the sort of relation to the plaintiff's road in which they meant to put themselves and had the power to put themselves. In other words, whether there has been any change of the legal possession of the premises demised by the plaintiff to the Lowell in 1884 really depends upon the Lowell and Maine contract of June, 1887. If that contract, as rightly construed, means that the Maine is to act as the Lowell's agent for the working of the plaintiff's road, all the facts respecting the actual working of the road are consistent with that theory; on the other hand, if it means that the Maine is to be assignee or alienee of the plaintiff's lease, the same facts may, though by no means so easily, be reconciled with that theory.

It is argued that the parties to the Lowell and Maine contract of June, 1887, as applied to the plaintiff's road, did not contemplate the working of the plaintiff's road by the Maine as the Lowell's agent under the statute expressly authorizing such an arrangement, and that if they had, different and simpler and more pertinent terms would have been used. But parties are not to be deprived of their rights because of the diffuseness or infelicity of the language creating them. If their purpose is clear, the substantial provisions of the contract, not the phraseology in which they are couched, will determine what the contract really is. The purpose of the parties not to make any assignment or subletting under the plaintiff's lease to the Lowell, or any transfer of possession of the demised premises, is too plain to be mistaken or denied. In that view, they provide that the Lowell shall remain in possession and operate the plaintiff's road. In the same view, they provide that the franchise to take tolls shall remain in the Lowell, and that it shall, in the first instance, receive all the earnings of the plaintiff's road. In the same view, they provide that the payment of all the rental of every kind shall continue to be made by the Lowell, the Maine only undertaking to indemnify it against all its expenses on account thereof. Then comes the provision that the plaintiff's road shall be operated in all respects under the direction of the Maine. And whatever might be the effect of this provision if it stood alone, yet, viewed in connection with the context, construed by the light of the statute and of the other provisions just referred to, there can be, it is submitted, but one result, namely, that the effect of the contract is not to put the Lowell out of possession of the demised premises and put the Maine in, but is simply to make the Maine. the Lowell's agent to work the road in the Lowell's name and in the Lowell's right.

CLARK, J. This is a writ of entry brought by the Boston, Concord & Montreal Railroad against the Boston & Maine Railroad, November 29, 1887, to recover possession of that portion of its railroad situated in the county of Merrimack. The plaintiff, recit-

ing the transfer of its road to the Boston & Lowell Railroad by a lease dated June 19, 1884, for the term of ninety-nine years, and the condition therein that the lessee should not assign or underlet the demised premises, or part with the possession thereof, except with the written consent of the lessor, alleges that on the first day of November, 1887, the Boston & Lowell Railroad corporation, in violation of its covenants, and without the written consent of the plaintiff and without right, assigned the plaintiff's railroad and delivered the possession of the same to the defendant; that the lease of the plaintiff to the Boston & Lowell Railroad thereby became forfeited; and that, in accordance with its provisions, the plaintiff entered upon the demised premises on the eighteenth day of November, 1887, for the purpose of enforcing the forfeiture and determining the estate thereby granted, but the defendant refused and still refuses to surrender the possession of its railroad to the plaintiff. The action is founded upon an alleged violation of the covenant not to assign, underlet, or part with the possession of the demised premises except with the written consent of the lessor; and the question is whether there has been such a violation of that covenant as to work a forfeiture of the lease.

No question arises in this action as to the validity of the Boston, Concord & Montreal lease to the Boston & Lowell Railroad, or the legality of the transfer of the plaintiff's railroad to the Boston & Lowell Railroad corporation under it. The action proceeds upon the assumption that the Montreal lease was originally a valid contract; and the ground upon which the plaintiff now seeks to be relieved from the further operation of it is, an alleged forfeiture of the demised estate, resulting from a violation of its covenants by the Boston & Lowell Railroad in assigning, underletting, or parting with the possession of the plaintiff's railroad, by and under a contract of lease to the Boston & Maine Railroad, dated June 22, 1887, and a transfer of the possession of the property and estate demised thereby, on the eleventh day of October, 1887, to the Boston & Maine Railroad. The plaintiff claims a forfeiture on the ground that the Boston & Lowell Railroad, by the lease of June 22, 1887, demised to the Boston & Maine Railroad its contract of lease of June 19, 1884, with the Boston, Concord & Montreal Railroad, and that the execution of the lease of June 22, 1887, to the Boston & Maine was of itself an assignment of the plaintiff's road and a violation of the covenants of the Montreal lease; and that the Boston & Lowell Railroad corporation have parted with the possession of the plaintiff's railroad to the Boston & Maine Railroad.

The Montreal lease provides that the lessors may enter and determine the estate thereby granted in case of a breach of any of its covenants; and the covenant for a violation of which a forfeiture is claimed is as follows: "Said second party [Boston & Lowell Rail-

road] covenants and agrees that it will not assign or underlet the premises hereby demised, or part with the possession thereof, except with the written consent of the first party" (Boston, Concord & Montreal Railroad).

The provisions of the Maine lease of June 22, 1887, bearing upon the question under consideration, are the following: "The lessor [Boston & Lowell Railroad] doth grant, demise, and lease unto the lessee [Boston & Maine Railroad], its successors and assigns, its railroad and railroad property of every description, . . . and all rights, franchises, easements, privileges, and appurtenances thereto belonging, together with the right to demand and receive all tolls, rent, revenue, income, and profits of the demised premises, including also therein all the right, title, and interest of the lessor in and to any and all railroads operated by it, under lease or otherwise, so far as the same are assignable or transferable by the lessor without violation of law or of agreement, but not otherwise; and in and to any bonds, obligations, and contracts of or with other railroads, corporations, or individuals, and all income or other advantages and benefits to be derived therefrom . . . ; hereby assigning and transferring unto the lessee, subject to all legal obligations and incumbrances thereon, all its railroad, railroad property, franchises, and assets of every description, except as above stated.

"The lessee shall pay all operating expenses of the lessor, and of all railroads of which it shall come into possession, or which it shall operate under and by virtue of this instrument, there being included therein as part thereof all repairs and renewals; all expenditures arising out of any contract, obligation, business, negligence or misfeasance, or however otherwise arising, and whether the liability for the same now exists or be hereafter created, in any way connected with the use and operation of the demised premises, or of railroads operated by the lessee or lessor as herein provided, and including damages to persons or property . . . The lessee shall pay, as the same become due, the rentals of all railroads of which it shall come into possession, or which it shall operate under and by virtue of this instrument, during the continuance of this lease, and of all roads leased to the lessor according to the terms of the several leases, and the interest on the indebtedness of the lessor, and on the indebtedness of all roads leased or operated by the lessor which this lessor is under obligation to pay, a schedule whereof is hereto annexed . . .

"The lessor covenants that if it be found impracticable to at once deliver immediate possession of any railroad leased or operated by it at the inception of this lease, by reason of any agreement to the contrary or other reason, it will use all reasonable efforts to deliver, and will deliver, possession thereof as soon as practicable. The lessor shall, meanwhile, continue in the possession of such railroad, and, under the direction of the lessee in all

respects, shall continue to use and operate the same under its contract with the company owning the same, and to pay the rental or other consideration agreed to be paid for the use of the same, and to receive the earnings thereof, but shall immediately transfer and pay over all such earnings to the lessee to its own use, which, in consideration thereof, shall reimburse the lessor for all expenditures, and indemnify and hold it harmless against all costs, claims, and liabilities arising out of the lessor's possession and operation of said railroad, or under and by virtue of its lease or other contract for operating the same.

"The lessee shall use and operate the railroads and properties herein demised, in accordance with the charter of the lessor, and of the several corporations whose roads are so operated  .  .  ; shall furnish all cars, engines, rolling-stock, and equipment of every description required, in addition to the like property hereby demised, for the due operation of the railroads operated under and by virtue of this lease; shall observe and perform all the provisions of contracts of the lessor with railroads now leased or operated by it, under the provisions of this indenture  .  .  ."

An examination of these provisions of the Maine lease and of the whole instrument does not admit of a reasonable doubt that the intention of the parties was to transfer all the interest of the Boston & Lowell corporation in its railroad and railroad property, and the practical operation, management, and control of the same, to the Boston & Maine Railroad. It is conceded that the lease went into actual operation October 11, 1887, and that the Maine and Lowell corporations have since been acting under it. Upon these facts the question of the forfeiture of the Montreal lease is not a difficult one.

The provision in the Montreal lease that the Lowell corporation should not assign, underlet, or part with the possession of the demised premises, except with the written consent of the lessor, was designed to secure a personal performance of its covenants by the Lowell corporation. The lessor had the right to choose their tenant, and, whatever may have been its purpose in doing it, the conclusion is irresistible that the stipulation against assigning, underletting, or parting with the possession of the demised premises was inserted in the lease to secure the exercise of the personal integrity, discretion, and judgment of the lessee in shaping the policy and controlling the management and operation of the road. The language of the lease is susceptible of no other reasonable interpretation.

By the Maine contract of June 22, 1887, the Lowell corporation leased its railroad and railroad property to the Boston & Maine Railroad, and agreed to continue in the possession of the Montreal road, which it could not lawfully lease, and to use and operate it under its Montreal lease, in all respects under the direction of the Maine corporation. Nothing was done under the

Maine contract until October 11, 1887, when the Boston & Maine corporation took possession of the property leased to it by the Lowell company, and the lease went into operation. Since then the Lowell company claims to have operated the Montreal road,—presumably according to its agreement with the Maine corporation. There is no evidence or claim that it has operated it in violation of the terms of the Maine contract. But it is entirely immaterial whether the Maine corporation has exercised any actual control over the management and operation of the Montreal road, or that the Lowell company has operated it without consulting the Maine corporation. If the fact is so, it is merely evidence that the management of the Lowell company has been satisfactory to the Boston & Maine. Whenever the Maine corporation chooses to interfere or exercise active control, the Lowell is bound to obey. It may interfere at any moment.

The Lowell company has voluntarily parted with its power to control the operation of the Montreal road, and has become the agent and servant of the Boston & Maine Railroad, and its possession is the possession of the Maine corporation. This, in spirit and in substance, is a breach of the covenant of the Montreal lease and a forfeiture of the estate granted by it. If the condition of the Montreal lease had been in terms, as it is in legal effect, that the lessee should not assign, underlet, or part with the possession of the Montreal road to the Boston & Maine Railroad Corporation, it would not admit of a question that the execution and operation of the Maine contract of lease was a violation of that condition.

CARPENTER, J. By the first lease, the plaintiff (the Montreal company) conveyed its railroad to the Lowell for the term of 99 years from June 1, 1884. The second lease, made by the Lowell to the Maine, and dated June 22, 1887, is for the term of 99 years from April 1, 1887. In the first lease the Lowell covenanted that it would operate the plaintiff's road during the term, and would not assign or underlet it, or part with the possession of it, except with the plaintiff's written consent; and that if the Lowell violated any of its covenants, the plaintiff might enter upon and take possession of the road, and thereby determine the Lowell's estate therein.

In the first article of the second lease the Lowell conveyed its own road and all roads leased to it, so far as they were assignable without violation of law or of agreement, and the Maine agreed to pay the rent of all roads leased to the Lowell. By this agreement, read as it must be with the second article and the rest of the instrument, the Maine bound itself to pay the rent of all roads leased to the Lowell, whether they were assignable or not.

The second article is as follows :

" The lessor covenants that if it be found impracticable to at

once deliver immediate possession of any railroad leased or operated by it at the inception of this lease, by reason of any agreement to the contrary or other reason, it will use all reasonable efforts to deliver, and will deliver, possession thereof as soon as practicable. The lessor shall meanwhile continue in the possession of such railroad, and, under the direction of the lessee in all respects, shall continue to use and operate the same under its contract with the company owning the same, and to pay the rental or other consideration agreed to be paid for the use of the same, and to receive the earnings thereof; but shall immediately transfer and pay over all such earnings to the lessee to its own use, which in consideration thereof shall reimburse the lessor for all expenditures, and indemnify and hold it harmless against all costs, claims, and liabilities arising out of the lessor's possession and operation of said railroad, or under and by virtue of its lease or other contract for operating the same."

This contract was made without the plaintiff's consent, and the performance of it by the Lowell and the Maine was begun October 11, 1887. Thereupon the plaintiff, having duly asserted its right of forfeiture by entering upon and taking possession of its road so far as it could without personal violence, properly brought against the Maine this real action (*Walker* v. *Walker,* 63 N. H. 321), in which, by agreement, the Lowell has been joined as a defendant.

No special plea has been filed, and by the ninth rule of court (56 N. H. 581, 582), in the absence of such plea, the case would be tried on the general issue. Under this plea the plaintiff would be entitled to judgment against both defendants on the first count, because the only estate claimed by either of them is one for years and not a freehold. The plaintiff would also be entitled to judgment against the Maine, because by the plea of *nul disseisin* that corporation would admit itself in possession (*Fletcher* v. *Chamberlin,* 61 N. H. 438, 470), and thereby admit a violation of the Lowell's covenant against a change of possession. But defective pleading may be amended. The parties understood that no question was to be raised on the want of special pleas, and that the answer of each defendant to the second bill in equity was to be treated as its plea to this action. Though such a practice is irregular and not approved, the case is considered and decided as if the material facts stated in the answers were properly and formally pleaded.

Each defendant admits the execution of the second lease, and makes a copy a part of its answer. The Maine denies that before "October 11, 1887, it managed and controlled the . . . Lowell . . . corporation, or any part thereof; or any of its leased lines including the plaintiff's railroads; that after October 11, 1887, it operated or continued to operate the roads of the plaintiff, except as hereinafter alleged and stated;" and alleges that the Lowell,

"pursuant to the covenants of its lease to the defendant of June 22, 1887 [the second lease], has remained in possession thereof, and operated the same in all respects conformably to said contract." The Lowell alleges that " it did not and never has assigned, or underlet, or parted with the possession of the premises demised to it by the plaintiff, . . . either to the . . . Maine . . . or to any other corporation or person, and has not parted with the control thereof, but still possesses, operates, and controls the same in accordance with the provisions of " the first lease ; but does not deny, and by not denying admits, the performance of its covenants in the second lease after October 11, 1887, as averred by the Maine. Both defendants distinctly present the exact issue to be tried. They say that the Lowell, by making and performing its contract with the Maine, has not assigned, underlet, or parted with the possession of the demised premises. And they maintain in argument, as they aver in their answers, that the Lowell, though it uses and operates the plaintiff's road under the direction in all respects of the Maine, for the Maine's exclusive benefit, "still possesses, operates, and controls the same in accordance with the provisions of said lease" from the plaintiff. They present the question whether a performance of the second lease is a violation of the first.

Did the Lowell, by making and performing the stipulations of the second lease, break its covenant not to assign the demised premises or its covenant not to part with the possession? It might part with, and the Maine might take possession of, the plaintiff's road without a legal assignment. *West* v. *Dobb,* L. R. 5 Q. B. 460 ; *Quackenboss* v. *Clarke,* 12 Wend. 555. It might make an assignment without parting with the possession. *McMurphy* v. *Minot,* 4 N. H. 251 ; *White* v. *Hunt,* L. R. 6 Exch. 32 ; *Corporation of Bristol* v. *Westcott,* 12 Ch. Div. 461 ; *Williams* v. *Bosanquet,* 1 B. & B. 238 ; *Church* v. *Brown,* 15 Ves. 265.

The plaintiff's object in requiring the Lowell to covenant against alienating or parting with the possession of its road was legitimate. A faithful performance of the covenant might be of great value, and its non-performance a great injury, to the plaintiff. The parties agreed that the plaintiff should have, as security for its performance, the property leased. Whether the plaintiff is in fact injured by a violation of the covenant is not in this case material.

By the common law leases for years were forfeited if the tenant disaffirmed the lessor's title, claimed a greater estate than he was entitled to, or aliened in fee. 4 Kent 106 ; 2 Bla. Com. 274, 276 ; Bac. Abr., Leases T., 2; *De Lancey* v. *Ganong,* 9 N. Y. 9. The covenants of a lessee, and provisos for a reëntry upon a breach of them, are, like other contracts, to be construed fairly and without favor to either party. A strained and forced interpretation is not to be given them in order to defeat their object. The intention of the parties,

as expressed by the language of the whole instrument, is to be found and enforced. *Davis* v. *Elsam*, 1 M. & M. 189; *Goodtitle* v. *Saville*, 16 East 87, 95, 96; *Croft* v. *Lumley*, 6 H. L. Ca. 672, 693; *Corporation of Bristol* v. *Westcott*, 12 Ch. D. 461; *Hayne* v. *Cummings*, 16 C. B. N. S. 421, 427; *Doe* v. *Keeling*, 1 M. & S. 95; *Roe* v. *Sales*, 1 M. & S. 297; *Doe* v. *Spry*, 1 B. & Al. 617; *German* v. *Chapman*, 7 Ch. D. 271; *Bishop of St. Albans* v. *Battersby*, 3 Q. B. D. 359, 362; *Whitwell* v. *Harris*, 106 Mass. 532, 537.

Technical terms or special words are not necessary to an assignment; any language which shows the intention of the parties to transfer the property from one to the other is sufficient. The form of the instrument is immaterial. If it has the legal effect to pass to another the lessee's interest in the whole or in any part of the demised premises for his entire term or the remainder of his term, it is an assignment. An under-lease for the whole term is an assignment. *Hicks* v. *Downing*, 1 Ld. Raym. 99; *Beardman* v. *Wilson*, L. R. 4 C. P. 57; *Bedford* v. *Terhune*, 30 N. Y. 453. Although by the under-lease a rent exceeding the original rent is reserved, and it is expressly stipulated that the so called under-tenant shall hold as the tenant of his grantor, he is nevertheless in law the tenant of the original lessor. *Wollaston* v. *Hakewill*, 3 M. & G. 297, 322, 323; *Parmenter* v. *Webber*, 8 Taunt. 393; Bac. Abr., Leases, I, 3. A lessee's grant of all his interest in the whole or in a part of the premises is an assignment. *Dartmouth College* v. *Clough*, 8 N. H. 22, 29; *Trustees* v. *Streeter*, 64 N. H. 106; Com. Dig., Condition E. A lessee of one hundred acres, on condition that he shall not assign, can no more convey one acre without breaking the condition than he can ninety-nine or one hundred acres. His grant of ninety-nine and ninety-nine one hundredths acres is no more a breach than his grant of one hundredth of an acre. If A is bound not to alien a manor, his alienation of one acre, parcel of it, is a breach. Vin. Abr., Condition, U, a. 25. "If a lessee, by any instrument whatever, whether reserving conditions or not, parts with his entire interest, he has made a complete assignment; if he has transferred his interest in a part of the premises, he has made an assignment *pro tanto*." *Woodhull* v. *Rosenthal*, 61 N. Y. 383, 391; Com. Dig., Debt E; Cro. Jac. 411; *Palmer* v. *Edwards*, 1 Doug. 187, *note; Wollaston* v. *Hakewill*, *supra*. It is not material that all the plaintiff's franchises were not conveyed by the Lowell to the Maine, if such is the fact. It is enough if any one of them or any part of the plaintiff's property was conveyed. Nor is it material to the present questions whether the plaintiff's franchises are the principal thing of which its lands and chattels are inseparable incidents, or whether the tangible property is the principal to which the franchises are incident.

Whether the performance of the second lease in legal effect conveys to the Maine the franchises and property of the plaintiff, or

any part of them, or the possession of the property, is a question to be determined on a consideration not merely of the granting or other single clause of the lease, but of all the provisions relating to the subject. The plaintiff's road is not formally assigned to the Maine. On the contrary, it is excepted from the operation of the granting clause. But the plaintiff's franchises and property " after being taken out of the category of things conveyed . . . are then separately dealt with in a special clause of the contract." By the literal terms of this clause (the second article) the Lowell covenants that it will give to the Maine and that the Maine shall have the plaintiff's franchise of using, controlling, and operating the Montreal. The covenant that the Lowell shall " use and operate " the road "under the direction of the lessee in all respects" is an express agreement that the Maine shall use and operate it through the instrumentality of the Lowell as a servant, agent, or general manager. In the performance of their contract the Maine is the master, the Lowell the subordinate. In the absence of any question of estoppel, the Lowell is not, and the Maine is, responsible to employés with notice of the situation for their pay, to patrons and others for negligent injuries, and to the state for the performance of all the requirements of law relating to railroads. The Lowell is no more answerable in these particulars than any individual superintendent or general manager. *Aldrich* v. *Palmer*, decided in Grafton county, December, 1860, and not reported (for the head note, see 24 Monthly Law Rep. 32) ; *Stone* v. *Cartwright*, 6 T. R. 411 ; Sto. Ag., *ss.* 261, 263, 313 ; *Brown* v. *Rundlett*, 15 N. H. 360 ; *Sleeper* v. *Weymouth*, 26 N. H. 34, 38. It has no legal interest in the earnings : every dollar of them is the property of the Maine. If the Lowell can maintain an action to recover moneys due for freight, or funds in the hands of an employé or agent, a release by the Maine would be a good defence. Whatever money the Lowell receives, it is bound to pay over to the Maine " immediately." It has no lien. *Stillings* v. *Gibson*, 63 N. H. 1. In literal and explicit words, the Lowell agrees to give, and by performing the agreement does give, to the Maine the plaintiff's franchise of taking and receiving all the tolls—the gross receipts from the business of the road—to be held by the Maine for its exclusive benefit. It is not material that they are received by the Maine through the hands of the Lowell as an intermediary. If the road were discontinued, or ceased to be a source of income, the Lowell would lose nothing. Until 1983 the entire loss would fall on the Maine. The gift is not of such net profits as the Lowell by its management may realize, but of the gross tolls,—all the moneys that may be obtained by the use and operation of the property " under the direction of the lessee in all respects," during the entire remainder of the Lowell's term. This is an assignment. By it the entire beneficial interest of the Lowell in the plaintiff's property is conveyed to the Maine. By the grant of the profits of

land, " the whole land itselfe doth passe; for what is the land but the profits thereof ?" Co. Lit. 4, b. A devise of the use and income of land is a devise of the land itself. *McClure* v. *Melendy*, 44 N. H. 469; *Wood* v. *Griffin*, 46 N. H. 230, 234. The Lowell's subsequent grantee of all its right, title, and interest in the plaintiff's road would take nothing of value, assuming that by the grant he would acquire the possession of the road and the Lowell's right to use and operate it under the direction of the Maine. The naked possession of the road, with the barren right to operate it under the direction, and for the benefit of another, is worthless. Its value is in the right to control the management and take the usufruct of the property, in the possession of whomsoever it may be and by whomsoever it may be operated.

By the covenants of the second lease and the performance of them, the relation of principal and agent is established between the Lowell and the Maine. If the Lowell is the agent of the Maine, there is a forfeiture by assignment of title and of possession; it is not possible in law, or in fact, for the Lowell to hold and operate the plaintiff's road as the plaintiff's tenant according to the terms of the first lease, and also as the Maine's agent according to the terms of the second. The question is, Which one is the other's agent? The defendants say the plaintiff's railroad was excepted from the granting clause of the lease, because they " knew that any assignment or subletting or alienation " of the plaintiff's " franchises would cause serious trouble and mischief for all parties concerned," and this was " the exact thing " they " meant to avoid ; " they knew " a contract by one railroad corporation with another for the exclusive use of another's road could not be anything but a lease;" they knew " the indisputable rule of law . . . that whatever may be the rights of the principal and agent *inter sese*, as against all the world the agent's possession is always, and for all purposes, the principal's possession," but that as the Lowell could not exercise the plaintiff's franchises except through agents, it might without assigning or parting with the possession of the road employ any person or qualified corporation—might employ the Maine—as its agent to do its work; therefore they say, that in the use and operation of the plaintiff's road they must have intended to make the Maine the Lowell's agent; they could not have intended to make the Maine the principal and the Lowell the agent, for that arrangement would effectuate both a transfer of the title and a change of the possession; the legal effect of the contract is to " make the Maine the Lowell's agent to work the road in the Lowell's name and in the Lowell's right," and by the stipulation that the plaintiff's road shall be operated by the Lowell under the direction in all respects of the Maine, they meant, and their language must be construed to mean, that it shall be operated by the Maine under the direction in all respects of the Lowell.

By their contract the Maine controls the use and operation of

the plaintiff's road, takes all the profit, and bears all the loss and responsibility of the business,—is, in fact, the master; the Lowell operates the road under the control and direction of the Maine, has no part in the profit or loss, and no interest in the business,—is, in fact, the servant. To style the Lowell master or principal and the Maine servant or agent, if in any conceivable view permissible, subserves no useful purpose here. The legal relations of the parties are not changed by the misnomer. To say that A, who has authority to direct and control B in operating a railroad for A's exclusive benefit is B's servant and agent in the operation of the road, is to use language in a sense unknown to the law or in business.

The Maine and the Lowell intended that the plaintiff's property should be conveyed in fact, but not in law; that it should pass, but be held' not to pass. To see if by some peculiarity of judicial interpretation in New Hampshire their purpose can be accomplished, they say, The Montreal road is excepted from the operation of this agreement, but shall be controlled, used, operated, and enjoyed by the Maine in all respects as if it were included herein, except that the Maine's orders shall be transmitted through the Lowell. It is as if they had said, concerning the entire contract, This instrument is not and shall not be construed to be a lease. *Burke* v. *Railroad*, 61 N. H. 160, 167, 243.

The Lowell " doth grant, demise, and lease " its assignable roads to the Maine. A further provision, that " the Lowell doth also grant, demise, and lease its non-assignable roads to the Maine," would have been equivalent to a notice of readiness to surrender them to their owners without controversy. Concerning those roads, the instrument was so drawn as to raise the question whether the Lowell would " assign " them, " or part with the possession thereof," by performing an agreement to become the Maine's indemnified servant thereon, holding and operating them under the Maine's orders and paying all the earnings to the Maine. Instead of " doth grant, demise, and lease," or other ordinary terms of conveyance signifying a present assignment of those roads completed by delivery of the writing, the Lowell's possession of them and interest in them were disposed of by an executory contract in the future tense. The Lowell shall enter the service of the Maine as holder and operator of the Lowell's non-assignable roads under the direction of the Maine in all respects, and shall pay all the earnings to the Maine ; the Maine shall pay the rents and expenses, and shall indemnify the Lowell and hold it harmless.

The effect of the Lowell's covenants in the first lease cannot be avoided by a circuity of language or other verbal device in the second. To hold that the performance of the agreement, that the Maine shall exercise the plaintiff's franchise to control the use and operation of the road and shall receive and hold the tolls for its exclusive benefit during the entire remainder of the Lowell's term, is not a breach of the covenant against assignment, is to fritter

away the covenant and make it worthless. *Varley* v. *Coppard*, L. R. 7 C. P. 505, 507. The purpose of the condition against assignment is defeated. The provision might as well have been omitted. It has no substantial effect. What it forbids in form, it permits in substance. *Doe* v. *Carter*, 8 T. R. 300; *Doe* v. *Hawke*, 2 East 481; *Davis* v. *Elsam*, 1 M. & M. 189; *Jackson* v. *Corliss*, 7 Johns. 531; *Jackson* v. *Silvernail*, 15 Johns. 278; *Jackson* v. *Kipp*, 3 Wend. 230; *Livingston* v. *Stickles*, 7 Hill 253, 257, 258; *Gillis* v. *Bailey*, 17 N. H. 18, 21—*S. C.*, 21 N. H. 149, 157.

The defence that the Maine is the agent of the Lowell is a traverse of those covenants of the second lease that give to the Maine the control and the earnings of the plaintiff's road, and impose on the Lowell the duty of obedience. The possession of property held by a servant in his subordinate capacity is his master's possession. When the second lease took effect, October 11, 1887, it changed the Lowell's possession of the Montreal from that of a master to that of a servant, substituted the Maine for the Lowell as the principal in the possession and operation, and conveyed from the Lowell to the Maine the Lowell's rights of property and control. The Maine's possession, held for it by the Lowell as its servant, is a disseisin for which the plaintiff can maintain trespass or this real action against the Maine. If the Lowell had filed a plea of disclaimer, and the plaintiff had replied maintaining its writ, the Lowell would prevail. On a like issue between the plaintiff and the Maine, the plaintiff would prevail. The disseisin is a complete transaction, and not a promise to deliver possession when the plaintiff consents. Since the agreement that the Maine shall have the Lowell's interest and power has been carried into execution, it has not been a mere executory covenant to make an assignment. Divested of everything but possession as a servant, the Lowell is bound by the terms of the agreement to withdraw from its menial position "as soon as practicable." "Meanwhile," that is, until June 1, 1983, if the plaintiff does not give its written consent to an assignment, the Lowell is bound to remain in the service of the Maine, and, whether the plaintiff consents or not, the Maine is bound to pay the rent as it becomes due to the plaintiff, bear all the expense and loss of the operation of the road, and is entitled to all the profits. The only effect of obtaining the plaintiff's consent would be, that in the operation of the Montreal the orders given by the Maine would no longer be sent by wire, or otherwise, through the office of the Lowell. There is no occasion to consider the large amount of testimony presented on the irrelevant and immaterial questions whether the Maine, on and after October 11, 1887, exercised its stipulated power of direction in all respects by a general order entrusting the conduct and operation of the road to the Lowell as its general manager, or whether from time to time it issued special and specific orders, or, if it did, whether it sent them direct to the men in its employ,

or performed the idle ceremony of transmitting them through the Lowell.

In this suit at law the rights of the parties depend upon no general or special question of an equitable as distinguished from a legal character. The case is a simple one of broken contract. The Lowell agreed that if it transferred the plaintiff's road to another company the plaintiff might take it back; and the Lowell has made the transfer which it agreed not to make. There is no peculiar equity or want of equity that affects the legal merits. The court has no power to deprive the plaintiff of the remedy which the contract specifically provides.

The disfavor which a forfeiture meets in legal presumptions and technical rules is irrelevant, because here is no ambiguous language or doubtful construction. Those presumptions and rules do not alter the contract by which the Maine is to be put in the place of the Lowell as principal in the operation of the plaintiff's road until 1983 without the plaintiff's consent. Since the defendants have expressed their intention to make this change in written words that admit but one meaning, it is useless to inquire how probable or improbable it is that they intended to do what they have done. Were such inquiry made, it would be found not merely probable, but certain, that they intended to use the language of their covenants in the only sense of which it is capable. The words carefully chosen to express their purpose are so simple, full, and precise, that a mistake is impossible. It has not been suggested that there was a mistake. Had there been one, it could have been rectified on a bill in equity for the reformation of the contract. If such a bill had been filed, the decision of this case would, on motion and cause shown, have been postponed to await the result. On the question that would be raised in such a proceeding, there is in the three volumes of depositions abundant and unconflicting testimony which puts the point beyond a doubt. It shows that their intentions were what would necessarily be inferred from the second lease without extraneous evidence. The Lowell desired to let its own road to the Maine for 99 years if it was released from its obligation to pay rent, and from all its duties, liabilities, and risks as lessee and operator of the Montreal and other roads. If it went out of business on its own road, it did not propose to continue in business on the Montreal. The Maine desired to hire the Lowell and the Montreal, and to take the Lowell if it could not have both. When the bargain was put in writing, their purpose was expressed with professional accuracy and skill in provisions that would enable the Maine to keep the Montreal if the court should hold that the Lowell's covenants against alienation could be evaded by circumlocution.

As soon as the second lease took effect, October 11, 1887, the plaintiff refused to receive rent. By agreement of the parties, payments were afterwards made and received " on account," and

" without prejudice to the rights of either party." By receiving
rent before that time, the plaintiff did not waive the forfeiture
incurred by the transfer of the possession of its road from the
Lowell to the Maine, nor the forfeiture caused by the Lowell's
alienation of its leasehold title. A landlord does not waive the
breach of a condition by receiving rent before the breach occurs,
nor by receiving it after a breach of which he is ignorant. Until
October 11, 1887, there was no change in the possession of the
plaintiff's road. Before that day the Lowell held the possession
in its own right as proprietor; on and after that day as the ser-
vant and agent of the Maine. On this point the pleadings and
proofs concur. The denials and allegations above recited of the
Maine are an averment that the Lowell entered upon the perform-
ance of its covenants with the Maine, October 11, 1887, and not
before. In the second volume of the evidence, page 17, is a paper
signed by the president of the Lowell and by the president of the
Maine, in which those officers say that on that day the Lowell
delivered and the Maine received possession of all the Lowell's
assignable roads. The Maine did not take possession or control of
the Lowell's non-assignable roads before it took possession of the
assignable ones. When the second lease went into effect, October
11, 1887, and not before, the Maine began to exercise over the
plaintiff's road its power of direction in all respects,—took the
position of master; the Lowell began to use and operate the road
under that direction,—took the place of servant; and the legal
possession of the road passed from the Lowell to the Maine. If
the defendants had proved the waiver of a forfeiture incurred by
the Lowell's alienation of the title, it would not aid them,—it
would not be a waiver of the forfeiture created by the change of
possession.

If the Lowell's leasehold estate in the Montreal was not assigned
before October 11, 1887, by the unperformed covenants of the sec-
ond lease, it was assigned by the performance of those covenants
on that day and afterwards; and the forfeiture by alienation was
not waived by the plaintiff's receipt of rent, because it had not
then occurred. If, by the mere execution and delivery of the
lease without a performance of its covenants, the Lowell's
estate in the road passed to the Maine, the forfeiture was not
waived by the plaintiff's receipt of rent, because there is no evi-
dence in the case tending to show that prior to October 11, 1887,
the plaintiff had any notice or knowledge of the existence, deliv-
ery, or contents of the lease. If the defendants' omission to call
witnesses on this point when the depositions were taken had been
due to inadvertence, it must be assumed that they would have
moved to open the case for the admission of the evidence (if it
existed and they deemed it material) when their attention was
called to the subject by the printed and oral arguments of the
plaintiff. They were aware of the liberality with which parties

are relieved from the consequences of accident, mistake, or misfortune touching the merits of the cause, either in pleading or in proof, when they apply for relief. They have had abundant time and opportunity for such a motion, which they knew would be granted if it ought to be. One sufficient reason for their not making the motion would be its futility. Even if by the unperformed covenants of the second lease the Lowell's title was assigned before October 11, 1887, the plaintiff's receipt of rent prior to that day, with full knowledge of the existence, delivery, and contents of the lease, could not be a waiver of the forfeiture caused on that day by the change of possession.

In one of the defendants' briefs they contend that the Lowell could not, contrary to its covenant, assign the plaintiff's road to the Maine; that an assignment would be *ultra vires* and void; and that therefore "there has been no alienation by the . . . Lowell of the plaintiff's franchises and property." That is to say, the Lowell's covenant not to assign is incapable of being broken; and for an assignment made by the Lowell to the Maine and put by them into permanent effect from October 11, 1887, the plaintiff has no remedy, because by force of some technicality (which the defendants do not specify), although there is a breach of the covenant in fact, there is none in law. The position finds no countenance in either of the cases cited in its support. In *Ottawa R. R. Co.* v. *Black*, 79 Ill. 262, there is nothing suggestive of the idea that a corporation's covenant against alienation is not as capable of being broken as any other agreement, or that the Lowell could not convey the plaintiff's road to the Maine for 96 years, subject only to the plaintiff's right to enter and enforce the forfeiture. In *Doe* v. *Powell*, 5 B. & C. 308, the lessee's voluntary assignment would have been voidable at the election of the lessor, if there had been no bankrupt law. But the assignment was an act of bankruptcy on the part of the lessee; and it was held that his leasehold estate passed to his assignee in bankruptcy, and that this involuntary assignment, being an act of the law, was not a breach of the covenant. *Holroyd*, J , said the voluntary assignment "not only became void and a nullity *ab initio*, but was actually avoided by the bankruptcy and the proceedings under the same before any advantage was attempted to be taken of the supposed forfeiture. Under these circumstances, for want of the deed's operating in law as an assignment, it was not in consideration of law an assignment by the bankrupt, but in that respect the same as if no such deed had ever been executed by him." This decision, whether right or wrong, is irrelevant except in so far as it assumes that the voluntary assignment would have been a breach of the covenant and a forfeiture if it had not been annulled by the proceedings in bankruptcy. In this case there is no question of the operation of a bankrupt law. The stipulations of the second lease, by the performance of which the plaintiff's

road would be transferred from the Lowell to the Maine for the term ending June 1, 1983, went into effect when the Maine took possession of the Lowell, October 11, 1887. Between the Lowell and the Maine the transfer was effective, and would have remained in force 96 years if the plaintiff had not, by reasonable entry, exercised its right to object.

"Further, on the same grounds," say the defendants in the same brief, "there has been no dispossession of the Lowell by the Maine, neither corporation being competent to authorize or to acquiesce in it. If upon the evidence there has been any interference with the Lowell's full enjoyment of the franchises pertaining to the plaintiff's road, it cannot be regarded as other than the personal trespass of the individuals immediately concerned. . . . No case of that sort . . . can be heard or tried in the present suits, to which the Maine and Lowell are the only parties defendant." In other words, a corporation, like the king, can do no wrong; for injuries committed by its agents acting within the scope of their authority, the agents personally, and not their corporate master, are responsible. The grounds upon which the defendants put this exception to the law that regards the possession and acts of an agent as the possession and acts of his principal are not disclosed, and to sustain it no authority is cited. Until a change is made by the law-making power, corporations acting by agents, like individuals acting in the same manner, will continue to be capable of committing torts and violating contracts.

*Judgment for the plaintiff.*

Doe, C. J., and Smith, J., concurred in the opinions of Clark and Carpenter, JJ.

Bingham, J., *dissenting.* This is a real action. No formal plea has been filed; but, by agreement of the parties stated in oral argument, the facts alleged in the answers of the defendants to the plaintiff's bill in chancery, so far as material to their defence in this action, are to be treated as if formally pleaded. The actions were heard and submitted together. The defendants, in their answers, in substance set forth the instrument of June 22, 1887, deny that the Lowell assigned its estate or parted with the possession or control of the plaintiff's road to the Maine, and aver that the Lowell is the owner of the lease of June 19, 1884, in possession of the plaintiff's road under it, performing its duties and covenants to the plaintiff.

The plaintiff, June 19, 1884, leased its railroad to the Lowell for ninety-nine years from the first day of the month, and the Lowell covenanted in the lease not to assign, underlet, or part with the possession of the demised premises, except with the written consent of the plaintiff. The lease of the Lowell to the Maine is

dated June 22, 1887, and is for ninety-nine years from the first
day of the preceding April. The date of the lease is *prima facie*
evidence of the time of its execution, and it will be presumed to
have been delivered on the day of its date, unless the contrary is
proved. 4 Bac. Abr. 57; Wood Land. & T., *s.* 223; *Sweetser* v.
*Lowell*, 33 Me. 446, 452; *Seymour* v. *Van Slyck*, 8 Wend. 403, 414;
*People* v. *Snyder*, 41 N. Y. 397.

The plaintiff claims that the Lowell has broken its covenants
and forfeited the lease by assigning, and brings this action to
recover the premises. If the plaintiff's claim of forfeiture is
admitted, it waived it by collecting the rent which became due
after the breach, knowing that it had been committed. Tay.
L. & T., *s.* 497; *Croft* v. *Lumley*, 5 E. & B. 648; *Arnsby* v.
*Woodward*, 6 B. &. C. 519; *Ireland* v. *Nichols*, 46 N. Y. 413;
*Garnhart* v. *Finney*, 40 Mo. 449—*S. C.*, 93 Am. Dec. 303;
*Gomber* v. *Hackett*, 6 Wis. 323—*S. C.*, 70 Am. Dec. 467;
*Coon* v. *Brickett*, 2 N. H. 163.

But it is said there is no evidence showing that the plaintiff had
knowledge of the provisions or existence of the Lowell's lease to
the Maine prior to October 11, 1887. It is true that by reason of
an obvious inadvertence, the case does not afford formal proof of
such knowledge; but this does not seem to be of controlling impor-
tance, as railroads are public corporations, and those in whom they
are vested, so far as the public is concerned, are public agents
(Gen. Laws., *c.* 160, *s.* 123), and inasmuch as it does not admit of
contradiction that the fact of the lease and its provisions were
matters of general knowledge, and had become so well known in
this jurisdiction prior to the receipt of rent in September, 1887,
as to be notorious. *Lanfear* v. *Mestier*, 18 La. Ann. 497—*S.*
*C.*, 89 Am. Dec. 658, 663, 664, 667, 676, 681, 682, 694, 696,
and authorities cited in the note; *State* v. *Moffitt*, 73 Me. 278;
*Temple* v. *State*, 15 Tex. Ct. App. 304—*S. C.*, 49 Am. Rep., note, 201,
203, 204; *Opinion of the Justices*, 35 N. H. 579, 580; *Opin-*
*ion of the Justices*, 45 N. H. 607; *Lake Company* v. *Young*, 40
N. H. 420, 430; *Wells* v. *Company*, 47 N. H. 235, 260; *Division*
*of Howard County*, 15 Kans. 194; Cool. Con. Lim. 135;
*Moody* v. *State*, 48 Ala. 115; *Hall* v. *Brown*, 58 N. H. 93,
95; 1 Gr. Ev., *s.* 6; *U. S.* v. *Teschmaker*, 22 How. 392;
*Romero* v. *U. S.*, 1 Wall. 721; Const. Part II, *art.* 24; Gen.
Laws, *c.* 4., *ss.* 10, 11; House Journal, June session, 1887, *pp.*
75, 77, 80, 108, 116, 123, 470, 481, 483, 484, 486, 487, 488,
490, 491, 981; Argument of W. M. Chase before Railroad Com.,
June 23, 1887, *pp.* 1, 11, 14–17, printed and published in pam-
phlet; Argument of Harry Bingham before the same committee,
August 10, 1887, *pp.* 3, 5, 15, 18, 20, 21, 25, printed and pub-
lished in pamphlet.

If the plaintiff was not technically chargeable with knowledge
on the evidence appearing in the case, justice, as well as the estab-

lished· practice of the court, required that it should be reopened and the defendant allowed to make formal proof of the fact.    *Canaan* v. *Derush*, 47 N. H. 212, 215; *Wells* v. *Company*, 48 N. H. 491, 526; *Page* v. *Brewsters*, 54 N. H. 184, 187; *State* v. *Cashman*, 62 N. H. 697; *Bullard* v. *Railroad*, 64 N. H. 27, 36; *Chamberlain* v. *Lyndeborough*, 64 N. H. 563, 565.

The bill in equity was brought to obtain, on different grounds, the same result as the real action, and it received much attention in its preparation and in the argument.    It was dismissed by the court; and it may well be inferred that the defendants gave their attention to that case, and unconsciously neglected to make the preparation in this that they would have made had they been sure their rights were to be determined in it.    The court, of its own motion, considered the advisability of leaving open the question of waiver as a similar question was left open in *Chamberlain* v. *Lyndeborough*, *ante*, but it was denied.    The facts, as well as the law, were to be determined by the court in both actions, and the parties did not know with the usual certainty what questions of law or fact might become especially material, and could not well antici- pate the importance that the question of waiver assumed.    The defendants were guilty of no laches, and might well rely on the established practice of leaving similar questions open for further proof if found desirable to make it, and no presumption of fact adverse to them should be made.    Certainly, the fact that the defend- ants did not ᷉make an application, does not show the non- existence of a waiver or of the evidence to prove one.    This, however, is of slight importance, as the court will take notice of facts which are notorious without formal proof being made.

The claim that the Lowell forfeited the plaintiff's lease by executing the one to the Maine is of strict legal right, to which the rules of the common law apply,—that conditions subsequent are not favored in law, and are to be construed strictly because they tend to destroy estates, and the plaintiff, to defeat the lease of its own creation, must show a breach strictly within its letter.    *Hoyt* v. *Kimball*, 49 N. H. 322; *Page* v. *Palmer*, 48 N. H. 385; *Mc- Questen* v. *Morgan*, 34 N. H. 400, 404; *Chapin* v. *School Dis- trict*, 35 N. H. 445, 450, 452; *Eddy* v. *Company*, 65 N. H. 27; *Mactier* v. *Osborn*, 146 Mass. 401; *Smith* v. *Putnam*, 3 Pick. 221; *Riggs* v. *Pursell*, 66 N. Y. 193, 200; *Arnsby* v. *Woodward*, 6 B. &. C. 519; 4 Kent Com. 129; *Jones* v. *Reed*, 15 N. H. 68; *Dumpor's Case*, 1 Smith's L. C. 15; *Crusoe* v. *Bugby*, 2 Wm. Blackstone 766; *Doe* v. *Hogg*, 4 D. & R. 226; *Jackson* v. *Silvernail*, 15 Johns. 278; *Livingston* v. *Stickles*, 7 Hill 253; *Rosevelt* v. *Hopkins*, 33 N. Y. 81; *Church* v. *Brown*, 15 Ves. 258, 265; Tay. L. & T., ss. 402, 403; *Kinnersley* v. *Orpe*, 1 Doug. 56.

It is an important inquiry whether the instrument in question is a lease, or an agreement for one, so far as the plaintiff's railroad is

made the subject-matter of contract in it. This question is mainly one of intention. In the construction of written instruments, the intention of the parties is material, and, to ascertain it, resort may be had to the nature of the instrument itself, the situation of the parties executing it, the purpose they had in view, and the contemporaneous construction which they gave it. *Corwin* v. *Hood*, 58 N. H. 401; *Rice* v. *Society*, 56 N. H. 191, 197; *Morse* v. *Morse*, 58 N. H. 391; *Brown* v. *Bartlett*, 58 N. H. 511; *Driscoll* v. *Green*, 59 N. H. 101, 103; *Kimball* v. *Lancaster*, 60 N. H. 264; *Atwood* v. *Cobb*, 16 Pick. 227, 229; *Richardson* v. *Palmer*, 38 N. H. 212, 218.

If this evidence proves that the parties executing the instrument intended to convey the estate of the Lowell in the plaintiff's road *in presenti*, then it is a lease; but if it proves they did not, and that the intention was to make an agreement to convey, or a conveyance not to take effect unless something happened which might never occur and which had not occurred at the date of the plaintiff's writ, then it was such an agreement or conveyance. *Houghton* v. *Pattee*, 58 N. H. 326; Tay. L. & T., ss. 37, 38, 39, 42; Wood Land. & T., ss. 183, 185. The latter, both upon the law and the evidence, seems to be the true interpretation, and justice requires this construction if it will avoid a forfeiture of the Lowell's estate, and it can be done without violating the intention of the parties. If the legal title to the Lowell's estate did not pass to the Maine, there was no assignment, underletting, or parting with the possession, as the physical possession and dominion of the Lowell continued unchanged. Neither an agreement to convey, nor an assignment of the lease to take effect when the lessor shall give its consent in writing, as provided in the plaintiff's lease, is a violation of the covenant against assigning or parting with the possession. *Weatherall* v. *Geering*, 12 Ves. 504, 511; *Riggs* v. *Pursell*, 66 N. Y. 193, 200.

On the question whether a given instrument is a lease which conveys the estate, or an agreement for one which does not, the presence or absence of certain evidence has been held material, and in many instances decisive of what the finding should be. If the instrument contemplates the execution of a formal lease, or if anything remains to be done, or if there is the absence of words of present demise, or if the time fixed for the term to commence is uncertain, being dependent on an event which may never happen, or if construing the instrument a lease would work a forfeiture or render the instrument inoperative, it has usually been adjudged an agreement, and not a lease, especially in the last three instances. 4 Kent Com. 105; 1 Hill. Real Prop. 265, 266; Wood Land. & T., ss. 183, 185; *Buell* v. *Cook*, 4 Conn. 238; *Atwood* v. *Cobb*, 16 Pick. 227, 229; *Doe* v. *Clare*, 2 T. R. 739, 744; *Goodtitle* v. *Way*, 1 T. R. 735; *Bromfield* v. *Smith*, 6 East 530; *Gore* v. *Lloyd*, 12 M. & W. 462; *Roe* v. *Ashburner*, 5 T. R. 163;

*Jackson* v. *Delacroix*, 2 Wend. 433, 442; *Bicknell* v. *Hood*, 5 M. & W. 104; *Howard* v. *Carpenter*, 11 Md. 259; *Dunk* v. *Hunter*, 5 B. & Al. 322 ; *Brashier* v. *Jackson*, 6 M. & W. 549, 556; *Rawson* v. *Eicke*, 7 A. & E. 451; *Jackson* v. *Moncrief*, 5 Wend. 26, 29; *Jackson* v. *Meyers*, 3 Johns. 388, 394; *Jackson* v. *Clark*, 3 Johns. 424; *Ives* v. *Ives*, 13 Johns. 235; *Chapman* v. *Towner*, 6 M. & W. 100, 104; *McGrath* v. *Boston*, 103 Mass. 369; *Clayton* v. *Burtenshaw*, 5 B. & C. 41; *Phillips* v. *Hartley*, 3 C. & P. 121; *Weld* v. *Traip*, 14 Gray 330, 333; *People* v. *Gillis*, 24 Wend. 201; *Tempest* v. *Rawling*, 13 East 18.

Many of these tests are found in the instrument executed by the Lowell and the Maine. The language of part one indicates the purpose of the parties to make an instrument containing both a lease and an agreement. The operative words used are grant, covenant, and agree, the first being a word commonly used in making a present demise, while the other two indicate an intention to make a contract or agreement under seal. If the parties had intended to make simply a lease, they would have indicated it by using the common words grant, demise, and lease, which they used in part one, the granting part of the instrument, but which are entirely omitted in part two where the agreement is found, and where the word covenant is the only operative word used. These words are properly used in these places, and correctly express the intention of the parties.

In the granting part of the instrument, the Lowell's estate in the plaintiff's railroad is not conveyed; on the contrary, it is specially excepted. The parties refer therein to the Lowell's inability to convey without violating its agreements in the plaintiff's lease, and then except the plaintiff's road from the grant. This shows that both the Lowell and the Maine had in mind the Lowell's agreements as to assigning and subletting, and did not intend to violate them. The fact that the parties to the instrument specially excepted the plaintiff's railroad in the granting part, where its conveyance should be found if they intended to convey it, and the fact that they reserved it for a special agreement in part second, are equivalent to saying, We do not intend to lease the plaintiff's railroad, but to make an agreement to do so when it can lawfully be done. Again: If the parties intended to assign the Lowell's estate in violation of its covenants in the plaintiff's lease, why did they make this reservation and exception? The only reasonable explanation is, that when the parties made the instrument they did not intend to convey the Lowell's estate in the plaintiff's road, but to make an agreement to do so when they lawfully could.

Such being confessedly the purpose of the parties, did they abandon it, and convey and forfeit the Lowell's estate in the plaintiff's road, in making the stipulations in part two? To have this effect, language and provisions must be used admitting of no other reasonable construction. This does not appear. On the contrary,

part two begins with words of agreement, not of present demise, and refers to the inability of the Lowell to convey its estate in the plaintiff's road. Then follows the provision that the lessor will use all reasonable efforts to deliver the possession as soon as practicable, which is, in effect, an agreement by the Lowell to convey and deliver the premises to the Maine in a reasonable time, if the written consent of the plaintiff can be obtained—a contingency which might never occur. Wood Land. & T. 183; *Buell* v. *Cook*, 4 Conn. 238.

It is further provided, that the Lowell shall continue in possession, which is not usual in a lease which is intended as a present demise, especially if the subsequent possession is to be held by the lessor.

It is a good reason why part two should not be construed a technical conveyance of the Lowell's estate, that the parties had in part one of the same instrument made a lease in express and proper words, and why part two must mean something less, as it varies so widely in its form of expression, and has its own natural and proper meaning as an agreement, which cannot amount to a lease without doing violence to the words as well as the intention of the parties. 4 Bac. Abr. 135, 165, 166; *Goodtitle* v. *Way*, 1 T. R. 735; *Roe* v. *Ashburner*, 5 T. R. 163. The change in the language in part one of a present demise to that of a covenant or agreement in the second part, proves a like intention of the parties to change the meaning, and that a present demise was not intended by it. The use of such words in the former place, and their omission in the latter, show that the parties knew their proper use, that the omission was intentional, and that a present demise was not intended.

These considerations, taken in connection with the full knowledge of the parties that if the Lowell conveyed its valuable estate in the plaintiff's road it would work a forfeiture, of which the plaintiff's hostile management in the interest of the Concord Railroad would take advantage, are decisive evidence of the intention of the parties not to make a lease of the plaintiff's road, but merely an agreement for one, and such is the fair and legal construction of the instrument. *Doe* v. *Clare*, 2 T. R. 739, 741, 744; 4 Kent Com. 105; Hill. Real Prop. 265, 266; 4 Bac. Abr. 136; *Jackson* v. *Meyers*, 3 Johns. 388, 394. It is improbable that parties like the Lowell and the Maine entered into a bargain which contained stipulations plainly and clearly to the disadvantage of both, and this instrument is to be read in the light of this improbability. *Woodman* v. *Spencer*, 54 N. H. 507, 512; *Gardner* v. *Webster*, 64 N. H. 520, 521.

When the parties came to part second they had not made a conveyance, but in express terms had said they would not do so in violation of law. Then, with this expressed intention in view, they made the agreement in the second part, both knowing that the

Lowell had not the lawful right to convey its estate till it had obtained the required consent. In this situation the parties agreed, the Lowell that it would use reasonable efforts to obtain the right to convey its estate, and if it could do so within a reasonable time would convey it, and the Maine agreed to accept the conveyance. This is the agreement made by the parties in part second. It is for a lease, if the Lowell can lawfully make one; and it does not contain words of present demise or words indicating a purpose to make one, but shows the design of the parties to adhere to their previously expressed intention not to make one till it could be lawfully done.

It is true that further on in part second the parties make what may be called a "meanwhile" arrangement as to the management of the plaintiff's road during the reasonable time which the Lowell has to obtain the consent of the plaintiff that the Lowell may convey. In this temporary arrangement it is claimed that language is used that creates the relation of master and servant, which technically presupposes that the Lowell had conveyed its estate to the Maine and thereby worked a forfeiture. It not being claimed, however, that words of present demise are used, nor that the words used would convey the Lowell's estate unless the parties intended they should, the essential inquiry still remains, What was the intention? Is it probable that the parties intending to make a lease of the Lowell's estate in the plaintiff's road expressly excepted it in the granting part of the instrument, made an agreement in the agreeing part for a lease in harmony with their expressed intention to do so when the Lowell could lawfully make one, still, in this temporary "meanwhile" arrangement, intentionally make a complete conveyance of the Lowell's unexpired term of ninety-six years in one hundred and eighty-five miles of railway of the value of millions of dollars, by a technical, unnatural application of legal principles governing the relation of master and servant? It does not seem possible. The parties making the instrument are intelligent, straightforward business men. Their intention had been clearly expressed in the instrument not to convey the Lowell's estate, but to make an agreement to do so; and the "meanwhile" arrangement was temporary, only to exist during the reasonable time the Lowell had under the agreement to obtain the plaintiff's assent to an assignment, the Lowell retaining the ownership and possession of the property during the interval. The estate of the Lowell in so important a system of public railways as that of the plaintiff's is not conveyed by the technical interpretation of the agreement in the Lowell's lease, claimed by the plaintiff, when such a conveyance depends on a contingency which has never occurred, works a forfeiture, and is contrary to the intention of the parties; nor is it an assignment of the Lowell's estate in the plaintiff's road, which forfeits the same

under the common-law rules of strict construction of conditions subsequent. *Hoyt* v. *Kimball*, 49 N. H. 322, 327.

If part two is susceptible of being construed a conveyance of the class of roads and property coming within its provisions, the inquiry arises, When was it to take effect? It clearly was not intended to do so at once, but when the property could be lawfully delivered. The evidence on this point is so clear as to leave little doubt as to the conclusion. If part two conveyed the plaintiff's roads and property, to take effect at the same time the conveyance made in part one did, what was the object of the parties in making part two? If it was all to be conveyed, delivered, and become the property of the Maine at the same time and by the same delivery, why did the parties except it in part one and refer to it as not being assignable or transferable without violation of law or agreement, and why did the parties in part two say that "the lessor covenants that, if it be found impracticable to at once deliver the immediate possession of any railroad leased or operated by it at the inception of this lease, by reason of any agreement to the contrary or other reason, it will use all reasonable efforts to deliver and will deliver possession thereof as soon as practicable"? The parties knew that the assignment as to the plaintiff's road could not take effect before the Lowell obtained the plaintiff's consent to it without forfeiting the plaintiff's lease, and therefore they agreed, if the Lowell had not obtained the required consent at the beginning of the operation of the lease, that part two should not take effect at the time part one did by a delivery of the property conveyed by it, and the delivery of the property described in part two should•be postponed for such a reasonable time as would enable the Lowell by the use of all reasonable effort to obtain the necessary consent. In other words, the agreement of the parties in the lease was, that part two should not take effect at the inception, or beginning, of the operation of the lease (*Marvin* v. *M'Cullum*, 20 Johns. 288, 289, *Eastman* v. *Shaw*, 65 N. Y. 528), but should be postponed to a time when it could lawfully be done.

The exception of the roads in part one that come within the provisions of part two, and the special arrangement as to their delivery, made them a part of the instrument; and in its construction all its parts must be considered, and each given its due weight in determining the intention of the parties. If the parties had not intended this to be so, and their purpose was to convey the Lowell's leased roads and those operated by it without regard to their being assignable or transferable, then they would not have made the exception in part one, and would have omitted part two altogether. The construction claimed, that part two makes a present conveyance of all the roads coming within its provisions, to take effect at any time when

the roads in part one might be delivered, renders the exception aimless and part two useless verbiage, as the same result would have been accomplished by omitting both the exception and part two; and if the property described in both parts was conveyed, why was it not to be delivered in the second at the same time as in the first, unless it was agreed and was the intention and understanding of the parties, as well as agreed that part two should not take effect till the Lowell could lawfully deliver the property?

After the execution of the lease, and prior to October 11, the Lowell paid and the plaintiff received money as rent on its lease at four different times, amounting in all to the sum of $114,500, the last payment being September 30, 1887. To meet the legal presumption arising from the execution of the lease, that it was delivered and took effect on the day of its execution, and to avoid the waiver of the forfeiture which would be thereby incurred, it is claimed as a fact that the Lowell and Maine made some arrangement not contained in the lease, by which it was not to take effect till there was the physical delivery of the property, which took place October 11, and that the lease did not take effect till that time, when it became operative in all its parts. The arrangement sought to be established is found in the contemporaneous action and construction given to the lease by the parties to it, from its date to October 11, and the delivery then made, and the circumstances attending it. While these may tend to prove an arrangement that may avoid the waiver, they confirm beyond a doubt the interpretation of the lease, that part two was not to take effect till the roads coming within its provisions could be lawfully and should be actually delivered.

June 24, 1887, two days after the date of the lease, the directors of the Maine passed the following vote, which was recorded: " That under the lease to this company by the Boston & Lowell Railroad Corporation, the president is hereby authorized and instructed, for and in behalf of this company, to receive possession of the demised railroad and property (except as hereinafter stated) in such manner and at such times as may be agreed upon with the directors of said Boston & Lowell Railroad Corporation; and that until said Boston & Lowell Railroad Corporation can lawfully and without violation of agreement surrender to this company the possession and occupation of the roads and property now held and possessed by it under leases and contracts with the Nashua & Lowell Railroad Corporation, the Central Massachusetts Railroad Company, and the Boston, Concord & Montreal Railroad Company, respectively, said Boston & Lowell Railroad Corporation shall continue to hold and possess not only the roads and properties of said several companies, but also such equipment, supplies, materials, and other property as may be required to enable it to oper-

ate said leased and operated roads according to law and conformably to the obligations of said leases or contracts." The plaintiff's road was within the provisions of part two. June 29, 1887, the Lowell directors passed and recorded the following vote: "That under the lease by this corporation to the Boston & Maine Railroad, when executed, the president is hereby authorized and instructed, for and on behalf of this corporation, to deliver possession of the demised railroad and property (except as hereinafter stated) in such manner and at such time as may be agreed upon with the directors of said Boston & Maine Railroad; and that until this corporation can lawfully and without violation of agreement surrender to said Boston & Maine Railroad the possession and occupation of the roads and property now held and possessed by this corporation under leases and contracts with the Nashua & Lowell Railroad Corporation, the Central Massachusetts Railroad Company, the Boston, Concord & Montreal Railroad Company, the Stony Brook Railroad Corporation, and the Wilton Railroad Company, respectively, this corporation shall continue to hold and possess not only the roads and properties of said several companies, but also such equipment, supplies, materials, and other property as may be required to enable it to operate said leased and operated roads according to law, and conformably to the obligations of said leases or contracts, and shall continue to operate said leased railroads according to the terms of the said several leases."

September 28, 1887, the Boston & Maine directors voted and recorded the following: "That the president is hereby authorized and instructed, in the name and behalf of this corporation, and as soon hereafter as he may deem it expedient, to take and receive possession of the premises and property of which this corporation is entitled to the present possession, under the terms and provisions of the lease of the Boston & Lowell Railroad Corporation to this company, dated June 22, 1887." October 11, 1887, the president of the Lowell delivered to the president of the Maine the roads and property conveyed in part one, and did not deliver the roads then within the provisions of part two, of which the plaintiff's road and property were a part. The receipt executed and delivered at the time is,—

"Passenger Station, B. & L. R. R. Corporation.
"Causeway Street, Boston, October 11, 1887.

"On the day and at the place above named, the Boston & Lowell Railroad Corporation, through its president, Edwin Morey, delivered, and the Boston & Maine Railroad, through its president, George C. Lord, received, possession of all the premises and property the possession of which said Boston & Maine Railroad was then entitled to, under the terms and provisions of a lease by said Boston & Lowell Railroad Corporation to said Boston & Maine Railroad, dated June 22, 1887, the roads and property of

which possession is this day delivered and received, being all the railroads and property covered and described by said lease of June 22, 1887, except the roads and property held and possessed by the Boston & Lowell Railroad Corporation under leases and contracts with the Boston, Concord & Montreal, the Wilton, and the Stony Brook railroad corporations, and such equipments, supplies, materials, and other property as may be required to enable said Boston &. Lowell Railroad Corporation to operate said last named roads, pursuant to its respective contracts therewith.

[Signed]                              "Edwin Morey,
                    "President B. & L. R: R. Corp.
                                      "George C. Lord,
                              "President B. & M. Corp."

The evidence of George C. Lord and Edwin Morey, the presidents of the corporations, who made and received the delivery of the property and executed the receipt, is, in substance, that the roads which were then within the provisions of part two were not delivered, of which the Montreal was one, and that those which were within the provisions of part one were delivered; that they did not understand that the Maine was entitled to receive the delivery or possession of the plaintiff's road under the lease, or that the Lowell could deliver it without violation of law or agreement, and that it was understood by them October 11, when the other roads were delivered, that the Lowell was to continue in possession of the Montreal and operate it under the plaintiff's lease, and that the Maine had nothing to do with it and that this understanding was practically executed by the Lowell's operating the road on its own direction after October 11, the same as it did before; that there was no delivery or change made in the operation of the plaintiff's road, because the contingency on which it was to be delivered had not occurred, and the road remained in the same legal and physical condition as to the plaintiff as it did before October 11.

The roads conveyed in part one were formally delivered October 11, and the lease took effect then as to them if it had not before, but this did not affect the plaintiff's road. The contract with reference to that was entirely different. The agreement and conditions upon which it was to be delivered, and the time when it was to take effect, were different in this, that while in the first part the roads could be lawfully delivered at once without prejudice, in the second they could not without forfeiting the plaintiff's lease to the Lowell and doing great injury to its entire railroad system. This difference in the right and property of the Lowell in the different roads in its system was the reason why the parties made part second, and agreed that the lease as to the class of roads coming within its provisions should not take effect till they could be lawfully

delivered, although the lease could take effect at any time the parties might name as to the roads conveyed in part one.

October 11, the consent of the plaintiff that the Lowell might assign its lease had not been obtained, and its roads and property were still in a condition that they could not be delivered and have the lease take effect without a forfeiture, and they were not delivered, and the Lowell's lease did not take effect as to them, and the plaintiff's lease was not forfeited. The taking effect of part one, by the delivery of the property conveyed in it, did not affect part two, because under the agreement each part was to take effect on the delivery of the property conveyed in it. If the two parts had been written and executed separately as two instruments, but otherwise the same as now, no doubt would exist as to when and how each would take effect; and the intention of the parties being plain, a single signing would be sufficient, and the lease would take effect as to the property conveyed in part one when it was delivered, and as to the property in part two, when within a reasonable time thereafter the right was acquired to deliver it and a delivery could actually be made. This was the contemporaneous construction which the parties gave to the instrument. They delivered, October 11, the property which lawfully could be delivered on that day, and expressly excepted the property which came within the provisions of part two that they could not lawfully deliver. The lease as to part two was to take effect either on its execution, or, by the agreement of the parties, when the property described in it could and should be lawfully delivered. If it ever took effect as to that part, it was on its execution, as the property was not delivered, and could not have been lawfully before the date of the plaintiff's writ. It may be claimed that the "meanwhile" arrangement provided for its operation till there could be a delivery, which created the relation of master and servant. The reply to this is, that no provision of part two took effect till they all did; it did not take effect piecemeal. All the provisions were to take effect on the delivery of the property, and not before.

The parties, in their settlement of October 11, under the "to have and to hold" arrangement of part one, construed it to mean, in substance, as the "meanwhile" arrangement in part two reads, by the Maine's taking all the earnings, paying the rentals, operating expenses, and providing against all liabilities incurred from April 1. In the plaintiff's view the Maine was the master or principal from the date of the lease to October 11, receiving all the earnings, and responsible for all the operating expenses, claims, and liabilities, and the Lowell was its servant operating the roads of part one for the Maine, receiving and to receive not what the roads earned for compensation, but the rental provided for in the lease, and the running of those roads by the Lowell for the Maine was settled and adjusted in this way

October 11. Case, Book 2, *pp.* 18, 20, Iuts. 19, 32. After the date of the lease till October 11, taking the plaintiff's view, it was immaterial to the Lowell, whether it paid the expenses of operation or not, as to the sum it was to receive for doing the work. In principle, the same legal relation existed between the Lowell and the Maine during this period which it is claimed existed between the Maine and the Lowell after October 11 as to the plaintiff's road : still it is said it is unimportant because the lease had not taken effect, that it was to take effect on delivery and not before. The same reply is equally pertinent, and an answer to the claims made as to the relations between the Maine and the Lowell after October 11. There had been no delivery of the roads in part two, and it was not to take effect till a delivery was made. The same relations, both in law and in fact, continued to exist between the Lowell and the Maine, from October 11 to the date of the writ, that existed from the date of the lease till October 11. So far as the plaintiff's roads and property were concerned, no change had been made. The conclusion then is, if the lease did not take effect on its execution, it took effect as to the property conveyed in part one on its delivery October 11 ; and as to part two, the contingency stated in the lease not having occurred, the property coming within its provisions was not delivered, and the lease, as to it, had not taken effect at the date of the plaintiff's writ.

For these reasons, as well as for total want of equity in the plaintiff's case, I am unable to assent to the opinion of the majority of the court.

ALLEN and BLODGETT, JJ., concur in the foregoing dissenting opinion.